LittletoN, Judge,
delivered the opinion:
This case comes before the court under the act of June 26, 1910, as amended by the act of July 1, 1918, the alleged infringing acts of which the plaintiff complains having occurred both prior and subsequent to July 1, 1918.
Until March 29, 1922, plaintiff was the sole owner of the patent monopoly as expressed in U. S. Letters Patent No. 935222. At that time he executed a written assignment of his entire right, title, and interest in and to the patent in suit, and to any and all claims of infringement thereof, and damages and profits accruing from past infringements to Aktiebolaget Bofors. A few months later, on June 16, 1922, and prior to the filing of the petition in this suit, the Aktiebolaget Bofors by its president, Hans Holm, executed an instrument in writing before the consul general of the United States of America at Stockholm, Sweden, set forth in Finding V.
This instrument set forth that it was not intended by the assignment of the patent by the plaintiff on March 29, 1922, to assign or transfer to the Aktiebolaget Bofors any claim against the United States for manufacture or use of the patented invention. Since the assignment which had been executed by plaintiff was broad in its terms and transferred all claims of infringement, and damages and profits accruing for past infringement, the Aktiebolaget Bofors declared that it did not intend to acquire and had not acquired from plaintiff any claim which he might have against the United States for infringement of his patent and for damages therefor, and that corporation, by said instrument, relinquished, released, and set over to plaintiff any possible right or title that it might have under the instrument of March 29, 1922, to such a claim against the United States effective on the date of the assignment and transfer by plaintiff on March 29, 1922.
Until March 29, 1922, plaintiff was the sole owner of the patent monopoly as expressed in the patent in suit. Both the title to the patent and the right of action against infringement were vested in him.
*88 A transfer or assignment of the patent alone would not alter or aífect a right of action on an infringing act prior to such assignment. Moore v. Marsh, 7 Wall. 515; Spring v. Domestic Sewing-Machine Co., 13 Fed. 446; Robinson on Patents, Vol. III, section 937.
After a patentee has transferred a patent he may still maintain an action for infringement committed during his ownership. A patentee who has conveyed his patent and afterward relinquishes it may sue for violations of the monopoly during either period of his ownership.
The present question of title is not concerned with the fact that plaintiff did not have title to the patent at the time of filing the petition, but relates solely to the transfer of the right of action for past infringement to the Aktie-bolaget Bofors and the subsequent instrument executed by the corporation on June 16, 1922.
It has long been established that a patent owner may assign full legal title to his patent with or without the right of action for past infringement. If he should assign the legal title alone, the assignee acquires the right to sue only for infringement subsequent to his title, and the assignor obviously remains possessed of the light to sue for past infringement. When the patent owner, however, chooses to assign with the patent any claim for past infringement he may do so, and the assignee may then sue in his own name for such past infringement.
A reassignment of the right of action for past infringement to the original owner of the patent creates, or rather recreates, a joinder of the right of action with ownership of the patent during the period of infringement, and the original owner then becomes entitled to sue in his own name. If the present suit were between private parties no question of right of action could arise. How is the situation affected by section 3477, R. S., when the defendant is the United States? This section prohibits the assignment of claims against the United States and in Brothers v. United States, 250 U. S. 88, it was held that the provisions of this section applied to the assignment of patent rights. In that case Brothers acquired by assignment certain letters patent two and a half months prior to their expiration. *89 The court said, “ His claim to compensation is necessarily limited to this brief period since there could be no assignment to him of any unliquidated claim against the Government arising prior to the time he became the owner of the patent.”
In Richmond Screw Anchor Co. v. United States, 275 U. S. 331, it was held that section 3477 does not apply to the assignment of a claim against the United States which is created by the act of July 1, 1918, amending the act of 1910. The court said:
“ * * * section 3477 does not apply to the assignment of a claim against the United States which is created by the act of 1918 in so far as the act deprives the owner of the patent of a remedy against the infringing private contractor for infringements thereof and makes the Government indemnitor for its manufacturer or contractor in his infringements. ”
With reference to those rights of action which plaintiff had based upon acts of infringement prior to July 1, 1918, the decision in Brothers v. United States, supra, applies and hence the assignment on March 29,1922, to Aktiebolaget Bofors by the plaintiff was null and void as against the United States in so far as it undertook to convey to Aktie-bolaget Bofors any past right of action accruing prior to July 1, 1918. Such rights unquestionably remained vested in the plaintiff.
As to rights of action for acts of infringement occurring subsequent to July 1, 1918, it is apparent from Richmond Screw Anchor Co. v. United States, sufra, that section 3477 does not apply and that the plaintiff could assign such rights, of action accruing after July 1,1918, to Aktiebolaget Bofors and that Aktiebolaget Bofors could, in turn, with equal facility reassign such rights to the plaintiff. By the reassignment of the Aktiebolaget Bofors there was, therefore, entire joinder of all of his original rights and he became, therefore, in the same situation as if there had been no assignment and a subsequent reassignment.
What we have just said is based on the strict assumption that the original transfer by the plaintiff to the Aktiebolaget Bofors was intended to convey, and did convey, certain *90 rights of action against the United States. The second instrument of June 16, 1922, with the contents and the execution of which the plaintiff was fully aware, and in which he acquiesced, may be regarded as a disclaimer by the Aktiebolaget' Bofors instead of a reconveyance.
We are of opinion that the contentions of the defendant that the plaintiff is precluded from maintaining this suit are not well taken.
To better understand the nature of the invention in suit, reference is first made to mobile gun construction, to which branch of ordnance the invention is especially applicable. The component parts of a mobile,gun comprise the barrel from which the projectile is fired; a carriage generally provided with wheels for transportation purposes; recoil brake or mechanism for permitting the gun to recoil or move relative to the carriage during the act of firing so that the entire gun carriage is not displaced from its position and training or elevating mechanism whereby the gun muzzle may be depressed or elevated for any given range. The primary essential requisite of the entire assemblage is that of minimum weight concomitant with durability and service. A field gun must be adapted to be moved from place to place over rough terrain with minimum effort.
Various types of recoil mechanism are used, several being illustrated by the prior art in the present case. The simplest form is the one with which the invention in suit directly deals, and comprises a recoil mechanism located below the barrel of the gun. This location of the recoil mechanism is simpler and less expensive to manufacture than other types, and it is protected against damage from hostile fire. Such unsymmetrical location of the recoil mechanism however sets up an objectionable turning couple when the gun is fired. This turning couple causes the muzzle of the gun to jump which, in turn, causes a strain on the guides of the gun barrel and undue stresses in the elevating mechanism, as well as the jumping of the gun carriage about its anchoring spade.
The Olsson patent discloses a form of gun construction in which the recoil brake or mechanism is placed in this position.
*91 The patentee provides a combination of elements by virtue of which the objectionable turning couple may be offset or counteracted in whole or in part. He does this by providing a counterpoise or weight attached to the barrel of the gun diametrically opposite to the recoil brake or mechanism. By the use of the counterweight a neutralizing couple is introduced which will neutralize the objectionable turning couple to a degree dependent upon the weight of the counterpoise and its location and distance from the axis of the gun barrel as compared with the weight of the movable part of the recoil mechanism and the distance of its center of gravity from the gun axis.
In the preferred embodiment illustrated in the drawings, Figs. 1 and 2 below, of the patent in suit, the counterweight, 6, is shown mounted on the top of and at the extreme rear end of the gun barrel.

*92 The following diagram, Figs. 1 to 4, illustrates the purpose and effect of the Olsson counterpoise in the elimination of the objectionable turning couple in guns with recoiling brake mechanism:

Figure 1 shows a recoiling gun barrel of true symmetrical mass distribution, the center of gravity of which lies in the axis of the bore. When the gun is fired the powder pressure force will act upon the closed breech end of the barrel and will propel it to the rear, such force acting along the axis of the bore, as indicated by the arrow pointing to the right. Since action is always accompanied by reaction, the recoil of the barrel will be resisted by the inertia of the barrel, thereby setting up an inertia reaction force in opposition to the powder pressure force, as indicated by the arrow pointing to the left. This inertia reaction force will *93 act through the center of gravity of the recoiling mass and, since, in Fig. 1, the barrel is symmetrical as to mass distribution, the inertia reaction force will likewise be exerted along the axis of the bore, and hence the barrel will recoil directly in line with the axis of the bore and entirely free from any objectionable turning couple. So far as the gun barrel itself is concerned, there is no objectionable turning couple to be contended with. This is the purpose of the illustration of Fig. 1.
In Fig. 2 there is shown attached to the under side of the gun barrel a mass representing the recoiling parts of the brake mechanism which produces the objectionable turning couple referred to in the Olsson patent and represented by the upwardly pointing arrow at the muzzle of the gun. Since the gun barrel itself is symmetrical, its own center of gravity will always remain in the axis of the bore, and the powder pressure force will always act along that axis in propelling the barrel to the rear. The center of gravity of the recoiling mass of the brake mechanism, however, is located some distance below the axis of the bore, as represented by the dotted line marked “ lever arm.” Being attached to the barrel, the recoiling mass of the brake mechanism will naturally be propelled to the rear by the powder pressure force along with the barrel but, due to the location of the center of gravity of the recoiling brake mass below the axis of the bore, the inertia reaction force set up by such recoiling brake mass, since it must act through the center of gravity thereof, will be directed toward the muzzle of the gun along a line passing through said center and parallel to but offset from the axis of the bore, as indicated by the arrow pointing to the left in Fig. 2. The two forces at work, therefore, are the powder pressure force acting rearwardly along the axis of the bore, and the inertia reaction force of the recoiling brake mass acting in the opposite direction but below the axis of the bore. The distance between these two opposite parallel forces, which is the distance of the center of gravity of the recoiling brake mass below the axis of the bore, represents the lever arm. The result is that the two forces produce an *94 upward turning' couple which tends to cause the muzzle to jump upwardly. This muzzle jump of the gun barrel is due, therefore, solely to the added mass of the recoiling parts of the brake mechanism and is in no wise influenced by the gun barrel itself which, because of its symmetrical mass distribution, has its center of gravity directly in the axis of the bore.
In Fig. 3 there is shown attached to the upper side and at the rear end of the gun barrel a mass representing the recoiling mass of the Olsson counterpoise, and it will be noted in this illustration that the center of gravity of this recoiling mass is located some distance above the axis of the bore, as indicated by the dotted line marked “ lever arm.” Due to this added mass of the counterpoise, there will be set up an inertia reaction force passing through the center of gravity of the counterpoise and therefore along a line located above the axis of the bore, as indicated by the arrow pointing to the left. Consequently, the two forces at work pull in opposite directions from the opposite ends of the lever arm and tend to turn the gun barrel downwardly at its muzzle, as indicated by the arrow at the left, just as the recoiling mass of the brake mechanism in Fig. 2 tends to turn the barrel upwardly at its muzzle. This downward turning couple is not at all due to the gun barrel itself, which is symmetrical, but is due entirely to the recoiling mass of the counterpoise.
In Fig. 4 there is shown a gun barrel having fixed to it the recoiling mass of- the brake mechanism, as shown in Fig. 2, and the recoiling mass of the counterpoise, as shown in Fig. 3. Due to the location of these two different masses diametrically opposite to each other, that is underneath and on top of the gun barrel, respectively, the two inertia reaction forces set- up thereby neutralize one another and produce a resultant inertia reaction force which is located directly in the axis of the bore and therefore directly in line with the powder pressure force. The powder pressure force is indicated by the arrow pointing to the right, as before stated, while the resultant inertia reaction force is indicated by the long arrow pointing to the left. Since the upward *95 turning couple produced by the recoiling mass of the brake mechanism is neutralized by the downward turning couple produced by the recoiling mass of the counterpoise, the result is a balance of turning couples which leaves the barrel free to recoil directly in line with the axis of the bore and without any turning of its muzzle either upward or downward. In other words, notwithstanding the addition of the two extra masses, one above and one below the axis, the effect upon the gun barrel is as if no mass had been added either above or below, as shown in Fig. 1.
The single claim of the Olsson patent is as follows:
“A gun with barrel recoil, a recoil brake arranged in only one radial direction from the axis of the barrel, and a counterpoise placed diametrically opposite the recoil brake so that the center of gravity of the brake is thereby moved nearer to the axis of the barrel.”
The functional portion of the claim, which follows the recitation of the elements, states that the center of gravity of the “ brake ” is moved nearer the axis of the barrel, whereas it is the center of gravity of the entire recoil system, including the gun barrel itself that is shifted. This, on its face, is an apparent error as the addition of a counterweight could not shift the center of gravity of an individual member of the recoil mechanism, but would only alter the center of gravity of the entire recoiling mass.
Defendant argues that this renders the claim fatally defective and infers that the phraseology used was inserted by plaintiff in order to obtain an issuance of his patent and that, having done this, plaintiff is bound by an inaccurate and misdescriptive claim.
This contention is not in accord with the facts. The first office action was an objection suggesting that the original claim be redrafted and no art whatever was cited by the Patent Office. It was not a rejection. There was no necessity for plaintiff to write any limitation into his claim in order to obtain the allowance of a patent on his invention. It is obvious from a reading of the entire patent that it is the center of gravity of the entire recoil system that is shifted by the addition of the counterweight as specified by the group of mechanical elements called for in the claim.
*96 In the discussion of the problem which the patentee seeks to solve, he makes repeated reference to the “ recoiling system.” In lines 19 to 25 he states that “ * * * the recoiling system according to the present invention is balanced in such a way, that the arm of the said turning couple of forces is reduced,- i. e., in such a way that the center of gravity of the system is moved much nearer to the axis of the barrel.” (Italics ours.) In lines 38 to 52 it is stated “ * * * the center of gravity of the whole recoiling system would be situated at a comparatively great distance beneath the axis of the barrel if there were no other parts than those just mentioned, and owing to the fact that the resultant of the pression. of the powder gases at the firing acts along said axis a turning couple of forces is produced, the size of which is equal to the product of the recoil force which is equal to the pression backward of the powder gases, if frictions, etc., are eliminated and the distance between the axis of the barrel and the center of gravity of the recoiling system.” (Italics ours.)
There can be no doubt as to the patentee’s intention or of the “ essence of the invention ” when the claim is construed, as it should be, by reference to the entire disclosure.
The word “ brake ” as used in the claim, when thus in-tei'preted, is inclusive of the springs, pistons, cylinders, and all other structure associated with the braking function, and clearly means the “ entire recoil system.”
In Ericsson v. United States, 70 C. Cls. 401, this court said:
“ The words ‘ tire tape,’ used in connection with the words ' covering tightly binding the said elastic layer, etc.’; are obviously a mistake. No tire tape is disclosed in the drawings or described in the specifications, and we think the mistake was made during an amendment of the case in the Patent Office. ‘ Tire fabric ’ was intended, and the claim when construed in the light of plaintiff’s disclosed construction authorizes the substitution of. the correct material.”
See, also, Maunula v. Sunell, 155 Fed. 535, 542; Hiler Audio Corporation v. General Radio Co., 26 Fed. (2d) 475, 478.
*97 Thus interpreted, there can exist no doubt as to the terminology of the claim reading upon the 155 mm. Schneider howitzer, the various pertinent component parts of which are specifically described in Finding X.
An inspection of defendant’s Exhibits 8 and 9 discloses the fact that the location of the various elements of the defendant’s structure is substantially identical with that disclosed in Figs. 1 and 2 of the patent in suit. In the Government structure, the recoil mechanism is located beneath the barrel of the gun and the counterweight is located at the breech end of the barrel and on top in the same position as shown in Figs. 1 and 2 of the Olsson patent.
The defendant goes to some length in its brief in an attempt to establish that the counterpoise in the Schneider gun is not diametrically opposite the recoil brake or the combined center of gravity of the brake and the recuper-ator cylinders. This argument is based upon the theory that the center of gravity of the counterweight is displaced a few degrees to one side of a diameter drawn either through the center of the brake cylinder or through a point representing the resultant pull of the brake and recuperator cylinders.
The facts establish that as far as can be ascertained the center of gravity of the recoil mechanism lies in a perpendicular plane passing through the axis of the gun and the center of gravity of the counterweight is diametrically opposite thereto. See fifth paragraph of Finding X. This fact is supported by the testimony of the defendant’s own expert.
We are of opinion that the Government structure embodies the Olsson invention structurally and functionally, and the remaining issue before the court is one of validity of the patent in suit.
Defendant raises the question of validity on two grounds; first, anticipation by prior art, and secondly, lack of invention on the assumption that the Olsson structure involves mere mechanical skill.
The facts regarding the disclosure of twelve prior art patents are set forth in Findings XII to XIV, inclusive, *98 and there is no necessity to reiterate them in detail here. In none of them is the disclosure of excess metal on top of the gun barrel more than accidental or incidental, or for some other entirely different function.
In the Kline patent, No. 676649 (Finding XIII), the gun has a stay rod mounted on the top of the gun and extending from the breech to the muzzle for the purpose of preventing sag in the barrel. Any counterbalancing effect due to this stay rod would be incidental to its arrangement and location. No suggestion of the counterbalancing function appears and a reading of the Kline patent would not convey to the man skilled in the ordnance art a conception of the idea of counterbalancing as taught by the Olsson patent.
In the French patent to Marzari (Finding XIII), reference is made to a balancing function. The' principal object of the invention is to arrange the gun and its associated mechanism so that the entire masses swinging on the trunnions should have their center of gravity coincident with the trunnion. This patent thus deals with the adjustment of the center of gravity with respect to a swinging mass. It makes no disclosure or suggestion with respect to the balancing of the recoiling masses and teaches the art nothing in this respect.
In addition to the above patents, defendant makes reference to the annual report of the War Department for 1902 which describes and illustrates a field gun known as the Ehrhardt gun. (Finding XV.) This gun had an eccentric breech mechanism known as the Nordenfelt type, with the eccentricity so arranged as to give a substantial protuberance of metal directly on top of the barrel in much the same position as that of the counterweight of the Olsson patent. This protuberance of metal would act to raise the center of gravity of the recoiling mass above where it would have been if such protuberance were not present.
We are of opinion, however, that this construction does not convey to the man skilled in the art the concept of the Olsson invention. The protuberance is produced and results from the peculiar construction of the breech-block mech *99 anism. It forms a housing and its function as such is apparent. Any other result would be incidental in the same manner as the adding of weight by the tie-rod in the Kline patent previously discussed. The construction of the Nor-denfelt breech teaches nothing and conveys no idea of the Olsson invention.
The defendant further makes reference-to the three-inch field guns manufactured and used by the United States prior to 1907 as a disclosure of the invention in suit. (See Finding XYI.) This we fail to find. Any breech eccentricity, if present to such a degree as to cause a protuberance mass above the barrel, is merely incidental and does not convey the inventive idea expressed by the Olsson patent. It is well settled that accidental or incidental occurrences do not constitute anticipation. Tilghman v. Proctor, 102 U. S. 707, 711; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 66.
The next question is whether the Olsson structure involves more than the mechanical skill and knowledge possessed by “ the man skilled in the art.” Findings XVII and XVIII show that the turning couple of forces was recognized by ordnance experts and mathematicians prior to the Olsson invention and that it was desirable to reduce this powder pressure couple in guns by bringing the center of gravity of the recoiling masses near to or in line with the axis of the gun. Also, that the uses of counterpoise and counterbalancing were known in the mechanical and artillery arts prior to the Olsson invention. Possessed of this knowledge, would the ordinary workman skilled in the artillery art conceive of the Olsson construction? The answer to this question is often most difficult to give, particularly when, as in the present case, the solution of the problem appears comparatively simple after the inventor has solved it. It is well settled that the man skilled in the art possesses a lesser degree of mechanical skill and knowledge than the experts and trained technicians in that same art.
If, then, the concept of the invention is not apparent to those highly trained and skilled in the particular art to which it relates, it will not be apparent to the ordinary *100 man skilled in that art. This assumption may sometimes be used as a test in particular cases to assist the court in answering this ofttimes perplexing question regarding invention.
In Firth v. United States, 70 C. Cls. 132, this test was applied and the court stated:
“The test here is one of interpretation. Would the man skilled in the art, upon reading the Shoemaker disclosure, be led to omit the condenser C, together with its respective connections to the detector and to the inductance, and thereby obtain the beneficial results flowing through such omission and which have been adequately proved? We think not. We are assisted in arriving at this decision from the history of the proceedings in the 'Patent Office. As set forth in Finding VII, the examiner of the Patent Office queried the operation of the detector by means of a unipolar connection, and stated that it is not seen how there would be any current flowing through the detector and telephone.’ If the operativeness of the unipolar connection was not apparent to the Patent Office examiner, whose routine daily duty involved the constant study of intricate electrical inventions, it seems clear that the omission of the condenser C of the Shoemaker patent, together with its connecting wires between the inductance and the detector, would not be obvious to the mechanic skilled in this particular art.”
The evidence and facts in the present case warrant the application of the same rule.
In practising the Olsson invention a counterweight, which is seemingly a dead weight, is added to a field gun in which, as has previously been stated, the prime requisite is lightness and mobility. By the addition of this weight, however, recoil stresses are reduced and the weight of the gun and carriage structure are consequently reduced, resulting in an ultimate saving in weight instead of an increase and enables a high accuracy of fire to be realized in a mobile gun with the gun carriage and gun mechanism of minimum weight. (Finding XIX.) It is established that by the use of the Olsson invention with a counterweight of 150 pounds a net saving of 128 pounds in weight in the complete structure of the gun and carriage results. In other words, without the use of the Olsson invention with, a counterweight of 150 pounds it would be necessary to add ap *101 proximately 278 pounds to the cradle and to the trail so as to make these members capable of withstanding the forces to which they would be subjected. The facts establish that the use of the counterweight, as disclosed in the invention in suit, in connection with field artillery where weight is a factor, is contrary to the concept of those skilled in the art as seemingly adding a dead weight, when, in truth, its use has the opposite result. We think this paradoxical saving in weight, which is one of the results of the Olsson invention, would not be apparent to the man skilled in the art.
The defendant’s assistant to the chief of ordnance, an officer familiar with ordnance problems since 1894, objected to the 155 mm. howitzer because of the added weight of the counterpoise when a minimum of weight was desired.
The essence of the Olsson invention was, therefore, not evident to this highly trained and skilled expert. We think, therefore, it may well be assumed that it would not be apparent to the “ man skilled in the art.” In Loom Co. v. Higgins, 105 U. S. 580, at page 591, the court, in answer to the argument that the devices under consideration did not show invention because the combination set forth in the claim was a mere aggregate of old devices already well known, said:
“ This argument would be sound if the combination claimed * * * was an obvious one for attaining the advantages proposed — one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we can not yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to' invention. Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit.
*102 It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention,”
The plaintiff applied his invention to guns with recoiling barrels in such a way as to answer a problem that had long received the consideration and study of those who were experienced in field artillery without any solution. The objectionable turning couple in guns with a recoiling system was fully known and appreciated by ordnance experts, but they were unable, with their knowledge and mechanical skill, to solve the difficulty in the manner in which plaintiff accomplished it.
That the invention has commercial utility can not be denied. It is shown that the defendant actually used the same in its construction of the 155 mm. howitzer.
Defendant raises the point that section 4900 of the Revised Statutes, relating to the marking of patented articles, has not been complied with and therefore plaintiff may not recover. We think this contention is without merit. As no manufacture took place under the patent except the unauthorized manufacture upon which the charge of infringement is based, it was a physical impossibility for plaintiff to have complied with this statute. There can be no failure to mark unless there have been in existence articles susceptible of marking under the statute. The clear meaning of section 4900 is that if the patented articles are made and sold, and not marked as required, the patentee or his assignee can not recover damages against the infringers of the patent. The consequence imposed by this section is not intended for those who can not perform the duty required because there has been no manufacture or sale of the article, but for those only who could have performed it and did not. Dunlap v. Schofield, 152 U. S. 244; Wagner v. Corn Products Refining Co., 28 Fed. (2d) 617.
Plaintiff’s invention is a meritorious one and the patent is valid and has been infringed by the defendant. The plaintiff is therefore entitled to recover. Pursuant to an agreement of the parties, it is ordered that the case be remanded *103 and referred to a commissioner of the court to take testis mony upon the question of the reasonable and entire compensation.
Whaley, Judge; Williams, Judge; GkeeN, Judge; and Booth, Chief Justice, concur.
ON defendant’s MOTION EOE A NEW TRIAL
Littleton, Judge,
delivered the opinion of the court:
The defendant has filed a motion for a new trial on the ground that the court erred in holding that section 4900 of the Revised Statutes has no application to this case since the plaintiff did not manufacture and sell the article covered by the patent prior to the infringement sued upon. Nothing new that was not presented and argued on the original hearing is presented by the motion for a new trial.
The question whether section 4900 of the Revised Statutes requires actual notice to infringers before damages can be recovered in cases where neither the patentee nor his assigns or legal representatives, nor any one acting for them, manufactured or sold a patented article was before the court on the original hearing and was fully argued, and, in reaching the conclusion that the section did not require actual notice to the infringer where neither the patentee, his assigns, or legal representatives, nor any one acting for them, manufactured or vended the patented article, the court considered the reasons advanced in the motion for a new trial and the authorities cited in support thereof. There is some conflict of opinion in decided cases on the question, but in cases in which the statement is found that actual notice of infringement is necessary in order to recover damages even though there has been no manufacture or sale by the pat-entee, or any one acting under or for him, of the patented article, we find no convincing reason given for such view..
The provisions of section 4900 of the Revised Statutes can not be construed to require actual notice in the absence of manufacture or sale, and we think this is the construction which the court placed upon the section when, in Dunlap v. Schofield, 152 U. S. 244, it stated that “ The clear *104 meaning of this section is that the patentee or his assignee,, if he makes or sells the article patented, can not recover damages against infringers of the patent, unless he has. given notice of his right, either to the whole public by marking his article ‘ patented,’ or to the particular defendants by informing them of his patent and of their infringement of it.” The section specified the circumstances under which the notice must be given and the nature thereof., Notice is required only when the patented article is made or vended and the nature of the notice. is that the word “ patented,” together with the day and the year the patent was granted, shall be placed on the article, or, if the character of the patented article manufactured or sold is such that this can not be done, by affixing to it or to the package wherein one or more of the articles is enclosed a label containing a like notice. This provision can not be extended to require the giving of actual notice by the patentee to an infringer of his patent when neither the patentee, nor any one acting for or under him, has manufactured or sold the patented article.
The defendant argues that section 4900 was “ intended to. protect the unconscious infringement ” and that “ the unwitting infringer must be protected whether the patentee has seen fit to manufacture or not.” But we think the section was intended to penalize the patentee who by manufacturing and selling the patented article and failing to. mark it as required by the statute deceives the public by failure to mark and thus invites infringements, which, if he had fulfilled the statutory obligations, would not or should not have existed. The defendant quotes from section 614 of Walker on Patents, 6th edition, 1929, that “ No. damages or profits either at law or in equity can be recovered where the plaintiff failed to mark the patented articles, with the patent notice as required by the statute, except on proof that the defendant was duly notified of the infringement and continued, after such notice, to make, use, or vend the article so patented.”
In the second paragraph of section 614 of Walker on Patents, to which the defendant did not make reference,. *105 it is stated that “A verdict for actual damages can not be averted by evidence that the defendant was ignorant of the existence of the patent at the time he infringed. All in-fringers have constructive notice of all patents, because all letters patent are recorded in the Patent Office. There is no more injustice involved in the rule that infringers are bound to take notice of patents than there is in the rule that buyers of land are bound to take notice of the real estate records, or in the rule that all citizens are bound to take notice of the laws of their country. The amount of pecuniary injury which an infringement causes a patentee is not affected by the fact that the infringer did not know of the existence of the patent which he infringed.”
We think this states the correct rule and is entirely consistent with the view that we take of the question here. (See section 4883 of the Revised Statutes with reference to issuing and recording patents in books kept by the Patent Office for that purpose.)
The exception in section 4900 that the patentee may recover damages on proof that the defendant was duly notified of infringement and continued after such notice to make, use, or vend the article so patented relates to cases where there has been manufacture or sale and failure to mark. In other words, the patentee, notwithstanding his failure to mark the article as required, is given the right to recover damages upon notice of infringement. But the notice referred to does not relate to all cases but only to those where there had been manufacture or sale and failure to mark.
We find no merit in the motion for a new trial and it is therefore overrruled.
Whaley, Judge; Williams, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.