**TECHNITROL, INC.,**
Plaintiff,

v.

**CONTROL DATA CORPORATION and Honeywell, Inc., Defendants.**

**Civ. A. No. 17653.**

United States District Court,
D. Maryland.

May 13, 1975.

---

S. C. Yuter, New York City, John W. Avirett, 2d and Piper & Marbury, Baltimore Md., for plaintiff.

Allen Kirkpatrick, Kevin E. Joyce, Larry S. Nixon, Cushman, Darby & Cushman, Washington, D. C., Joseph A. Genovese, Control Data Corp., Rockville, Md., Donald N. Rothman and Gordon, Feinblatt & Rothman, Baltimore, Md., for Control Data Corp.

D. D. Allegretti, James V. Callahan, Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., and Arnold Fleischmann, Towson, Md., for Honeywell, Inc.

WATKINS, Senior District Judge.

On September 23, 1952, U.S. Patent No. 2,611,813 (the '813 patent) for "Magnetic Data Storage System" issued to T. K. Sharpless and E. S. Eichert, Jr. on application filed May 26, 1948. By mesne assignments Technitrol, Inc. is, and at all pertinent times has been, the owner of the patent.

In addition to the specification and drawings, the general nature of the alleged invention [1] is set forth in litigation in the Court of Claims in which Technitrol sued the United States for "reasonable and entire compensation" for alleged unauthorized use of inventions assertedly described and claimed in the '813 patent. See Technitrol, Inc. v. United States, Court of Claims (before a Commissioner), 164 USPQ 51, 52–53 (1969) and Technitrol, Inc. v. United States, 440 F.2d 1362, 1364–1366, 194 Ct.Cl. 596 (1971).

At the risk of over-simplification, the primary object of the invention was to provide means by which various offices or agencies ("positions") could quickly ascertain the availability (or non-availability) of airline seat reservations for a particular flight. The total number of seats available is stored in a register (a length of magnetic tape or a sector of a magnetic disc) and the number of confirmed reservations is also recorded. If an outside station desires to make reservations, data as to the number and flight are communicated to the centrally located storage unit. The appropriate storage register is selected, and the number of additional reservations desired is added to the previous total. If the sum of these is less than the number of available reservations, the two are added to provide a new total which is then stored back in the corresponding storage register where the new total is then available for similar access in the future; and the inquiring station is so notified. If the requested additional reservation, added to the reservations already made, would exceed the total of reservations available, the application is rejected, the inquirer is so notified, and the old number remains unchanged.[2]

All this involves a process of register selection; that is, it is necessary to locate a particular register later, and perhaps several times, in order that the previously stored information content may be accessed for a desired use. Until January 7–9, 1948 the proposed system, once it had started operation, permitted such accurate location of regis-

---

1. Plaintiff claims that '813 embodies four or five inventions, of which several apparently are claimed in the same claim. As a result of proceedings in the Court of Claims not more than two inventions need be considered.

2. This "store-if-no-exceed" feature was added in March 1948.

ter(s) as long as it continued operation without interruption. However, if there were an interruption, such as by a power failure, "position volatility" may occur.

As Commissioner Davis very clearly explained (164 USPQ at 52–53):

A particular aspect of the invention, significant to the license dispute here in issue, relates to the so-called memory reset feature by which position volatility of the system is avoided. To explain, on the common shaft with the information disks is a master or clock disk which has recorded around its face two channels of magnetic pulses —one channel has 160 evenly-spaced pulses, the other 1 pulse. The purpose of the clock disk, as its name implies, is to serve as a timing device to coordinate the timed-position of the information disks with other elements and circuits of the computer system. A pickup head is located over each channel. Thus, one head produces 160 evenly-timed pulses per revolution of the clock disk, the other one pulse per revolution. The 160-pulsehead is connected to a scale-of-ten electronic counter which produces one output signal for each 10 input pulses. Thus, the counter generates 16 pulses (160/10) for each revolution of the clock disk, and it thereby divides the information disks (on a common shaft with the clock disk) into 16 10-pulse registers, or information segments. Pulses from the scale-of-ten counter are applied through electronic circuitry to a digital counter which in turn produces 16 unique voltage combinations, each thus representative of one register on an information disk. When one of the voltage combinations matches up with, or coincides with, a similar combination from a remote station (generated by an operator seeking information about a particular

flight, or register), circuitry is activated by which the register is used.

It can be seen from the above that it is essential for the clock disk and the scale-of-ten counter to stay in synchronization. Otherwise, the counter will not produce signals representative of each register; or, to say it another way, the system would be position volatile. During normal operation, with power on and the equipment functioning properly, the clock disk and counter will stay synchronized. However, at startup initially, or after a power failure, the clock disk and counter may lose synchronization, e. g., if the clock disk continues rotation momentarily through inertia after electric power is cut off the counter and the motor. Also, when power is cut off, the counter, a purely electronic device, loses count; and on restart, its counts may not be synchronized with the start of a register on an information disk so that such counts would be arbitrary with respect to register positions. Thus, some means must be provided to synchronize the clock disk and counter on startup. The one pulse per revolution channel on the clock disk serves that purpose. It is connected through appropriate circuitry to reset the counters to zero after each revolution of the clock disk, thereby synchronizing the clock disk and counter if they are out of synchronization.

This automatic reset figure was Eichert's direct contribution to the system, developed by him January 7–9, 1948.[3] It is briefly described in the specification (Col. 4, lines 33–40):

"The one pulse per revolution output supplied from the clock disk 1 through amplifier $a_1$ is used to initially set the counters so that the registers on the disks will always maintain the same relation with the pulses on

---

3. Until then Eichert appears only to have made some suggestions as to Sharpless' drawings. Who is primarily responsible for

the "store-if-no-exceed" feature is not clear, but it is not important for the disposition of the pending motion.

the clock disk as checked by counters $b$ and $c$, even though the power be shut off and later turned on with the counters coming up containing arbitrary counts."

Frequent other references to "reset" occur in the specification, e. g., Column 4, lines 62 and 65; Column 5, line 41; Column 10, lines 5, 6, 14, 19, 22, 64 and Column 13, line 61. Nevertheless, the clock disk and assorted counters "are not expressly recited in any of the claims" (164 USPQ at 53) and Plaintiff so "concedes" (164 USPQ at 55); but Commissioner Davis held that they were included in claims 1–15 and 17–24 "in broad 'means' clauses" (164 USPQ at 53).

The significance of the automatic reset feature was stressed by Commissioner Davis in that it was only with the reset feature that *the* invention claimed in claims 1–15 and 17–24 occurred. 164 USPQ at 56:

> The record is clear that while Sharpless did considerable preliminary design work on the reservations system in mid-1947, it was not until early 1948, when working full time for Technitrol, that the problem of position volatility was recognized and solved by Eichert. Only then was there a complete system, as envisioned by the inventors and later disclosed in their patent application. Defendant makes much of the fact that a position volatile system is nevertheless operable in a legal sense because the problem of position volatility only arises at initial startup and startup after a power failure. Thus, defendant reasons, there was conception of the invention in suit before the position volatility problem was recognized and solved. In our view, however, while there may have been conception of *an* invention before Eichert came on the scene, it was not *the* invention disclosed and claimed in claims 1–15 and 17–24 of the patent in suit. The Sharpless and Eichert invention included the memory reset feature and

it is *that* invention with which we are here concerned . . . ."

Plaintiff concurs in this conclusion. In its statement of "Postion" it says (page 9):

> " . . . The memory synchronization solution feature for register selection is claimed in claims 1–15 and 17–24 . . . ."

Further, in "Plaintiff's Brief Opposing Defendant's Brief in Support of its Exceptions to the Commissioner's Report," filed July 2, 1970, Plaintiff stated:

> . . . Thus, the Commissioner's construction of the representative claims 23 and 5, directed to different aspects of the inventory control problem, substantially narrowed the scope of these two representative claims by incorporating into them the memory synchronization feature on the magnetic data storage invention defined by representative claim 19.
>
> *After studying the legal basis for the Commissioner's narrowing construction of the representative claims 23 and 5, plaintiff has acquiesced.*[*]
>
> The result is that there are two independent and distinct inventions involved; the claim 19 invention and the claim 16 invention . . . .

[*]As a practical matter, this means plaintiff's present position is that inventory control claims such as claim 23 and 5 cannot be infringed unless magnetic data storage invention claims such as claim 19 are also infringed. [Emphasis added by Defendant].

This mandatory inclusion of the automatic reset feature was necessary, so that Plaintiff could avoid a free license to the United States, since apparently the reset feature [4] is the only portion of the Sharpless-Eichert '813 patent disclosure occurring after Sharpless left the employ of the Government's contractor, under which employment the Government would be entitled to a royalty-free license.

With this background, Commissioner Davis held that "the" invention, "includ-

---

4. And possibly the "store-if-no-exceed" feature.

ing the memory reset feature" was conceived after and outside of the employment of Sharpless by the Government's contractor. The full Court of Claims held that the United States "is fully licensed under claim 16, and is also licensed under all other claims of the Sharpless patent except to the extent that those other claims may be limited to the system's automatic reset feature explained below. We leave to later proceedings the determination of whether the three representative claims other than 16 (5, 19, 23) embrace the automatic reset feature, and if so, whether those claims (and the patent) as so construed are valid . . . ." (440 F. 2d at 1364).

The court has been advised that on the basis of the holdings of Commissioner Davis and of the Court of Claims that the Government would be liable for infringement of claims involving the automatic reset feature, the Government has paid Plaintiff a substantial sum in settlement.

Defendants have filed a motion for summary judgment holding claims 1–15 and 17–24 invalid under the second paragraph of 35 U.S.C. § 112 requiring that:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Defendants contend that it was only when confronted with a licensing problem in the Court of Claims that Plaintiff took the position that the reset feature was asserted as vital to claims 1–15 and 17–24; and that had this been previously disclosed (as, it is argued, should have been done in the claims) it would have been easy to "design around" the reset feature. Defendants further argue that the reset feature is not essential to the functioning of Plaintiff's invention; and that if "reset" is required it can be effected mechanically, apart from Plaintiff's specification.

Particularly is the question of claim coverage of the reset feature important, since it is the only direct contribution of the so-called co-inventor Eichert (other than perhaps the "store-if-no-exceed" feature) and so a real question would be presented as to whether or not Sharpless and Eichert were co-inventors.

Defendants further point out that if the reset feature is, as Plaintiff asserts, "vital" to the validity of claims 1–15 and 17–24, then the earliest date of the invention is January 1948, which lets in the '827 patent, which patent Defendants assert (and are supported by their expert) teaches a system entirely responsive to the register selection recital of the claims of '813 patent in suit, but the '827 patent does not have a reset feature.

Defendants rely upon the well-established principle that "the claims made in the patent are the sole measure of the grant" Aro Manufacturing Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339, 81 S.Ct. 599, 601, 5 L.Ed.2d 592 (1960); that the specification and drawings are simply exemplary; the true measure of the invention is defined by the claims. Reeves Instrument Corp. v. Beckman Instruments Inc., 444 F.2d 263, 274 (9 Cir. 1971); White v. Dunbar, 119 U.S. 47, 51, 7 S.Ct. 72, 30 L.Ed. 303 (1886);[5] Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1934); Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 409, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1937).

■ As stated in Waldon, Inc. v. Alexander Mfg. Co., 161 USPQ 404 (S.D. Miss.1969):

> "Any important aspect which is deemed important to an invention which is sought to be protected by a patent should be stated with such specificity as to afford a notice and warning to

5. The famous "nose of wax" case.

the public of its importance to the device as a protected portion of the patent. Vague generalities and nebulous and obscured phrases in the claim should never be extended by judicial construction."

Plaintiff relies on 35 U.S.C. § 112, paragraph 3 as a basis for finding the automatic reset feature in claims 1–15 and 17–24. That paragraph provides that:

"An element in a claim for a combination may be expressed as a means or step for performing a *specified function* without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the *corresponding structure,* material, or acts *described in the specification* and equivalents thereof." [Emphasis supplied].

That the requirement of the second paragraph of Section 112 that the claim(s) particularly point out and distinctly claim the subject matter that the applicant regards as his invention has not been diminished by the third paragraph has been expressly held. Application of Lundberg, 244 F.2d 543, 547–548 (C.C.P.A.1957):

"The third paragraph of 35 U.S.C. § 112 made its initial appearance in the Patent Act of 1952. As correctly stated by appellants in their brief, this paragraph was designed, at least in part, to modify or overrule such decisions as Halliburton Oil Well Cementing Co. v. Walker, 1946, 329 U.S. 1, 67 S.Ct. 6, 10, 91 L.Ed. 3, and, as pointed out by an augmented Board of Appeals in Ex parte Ball & Hair, 99 USPQ 146 (Bd.App.1953), ' * * * some measure of greater liberality in the use of functional expressions in the definition of elements in proper combination claims is authorized by section 112, than has been permitted by some of the stricter decisions of the courts in the past.' This 'mea-

sure of greater liberality,' however, is subject to well defined limitations, for Congress did not intend by incorporating the third paragraph into section 112, to destroy certain basic precepts of patent law. Thus, though appellants' arguments would necessarily lead to the opposite conclusion, it is still true that 'the claim is the measure of the invention.' The requirement in the second paragraph of section 112 that 'the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention' has not been at all diminished by the addition of the third paragraph; the latter paragraph must be read in the light of the first and second paragraphs and given an interpretation consistent with their clear meaning . . . ." [Footnotes omitted].

The Patent Office Board of Appeals has also held that means plus function claims cover only the structure necessary to perform the specified function. Ex parte Birnbaum, 161 USPQ 635 (1968).

■ Defendants vigorously and plausibly argue that the second paragraph of 35 U.S.C. § 112 requires a necessary or causal relationship between the "specified function" and apparatus purportedly included in such a "means" plus "specified function" claim recitation. Plaintiff's contention that there is no requirement of any "causal relationship" when the "statutory means for performing a specified function . . ." is used "because the function is all that is required to be specified and if, as here, that function is definite, that is sufficient to comply with 35 U.S.C. [§] 112 in its entirety," [6] is unsound.

The court suggests, and finds, that this is a logical fallacy if there is no "causal relationship." Otherwise, there would be no way for the public (or a

---

6. Plaintiff's "Response Under Protest to Defendants' Motion for Summary Judgment in

Claims 1–15 and 17–24 on the Ground of Claim Indefiniteness," p. 8.

court) reasonably to assess the asserted, or valid, scope of the claim language.

Plaintiff further asserts [7] that " 'Register selection' is a definite function so that claims 1–15 and 17–24 which recite the 'register selection' function are clearly definite."

If the claims reciting "register selection" had said, as they easily might (and should, and probably would, if that were intended) "in conjunction with the automatic reset function" there would be no room for argument that Plaintiff was right. The absence of such a recital, in the claims, or such an assertion in the prosecution in the Patent Office, militates strongly against such an interpolation.

With respect to Plaintiff's contention that the claims 1–15 and 17–24 do, and claim 16 does not, embody the "vital" automatic reset feature, it is necessary to consider the exact language of "representative" claims 5, 16, 19 and 23.[8]

Claim 5

"In an information storage system,

1. a central station,

2. a plurality of operating stations,

3. a transmission line extending from each of said operating stations to said central station,

4. a plurality of operating positions at each of said operating stations,

5. a plurality of registers at said central station adapted to receive numerical information and to have such information erased therefrom,

6. means under control of an operator at any one of said positions at any one of said stations for producing and sending over the line of said station a group of pulses indicative of a particular register and also containing num-

berical information which it is desired to store in that register,

7. means for preventing transmissions over the lines of the other stations during the operation at said one station,

8. means for preventing operations at the other positions of said one station during the operation at said one position,

9. means at said central station responsive to said pulses for selecting said register,

10. means operable upon selection of said register for indicating at said one position whether or not any number already stored in said register plus that to be stored exceeds a given number,

11. and means operable only in the event that said given number will not be exceeded for erasing the number already in said register and for storing therein the sum of the erased number and the additional number which it is desired to store."

Claim 19

"In an information storage system,

1. magnetic recording means having a plurality of information recording sections constituting registers and also having a register-selection section on which are recorded pulses coordinated with said registers,

2. means for producing from said recorded pulses different successively-occurring · register-selection voltage combinations representative respectively of said registers,

3. means under control of an operator at a remote position for producing a group of pulses indicative of a particular register and also containing numerical infor-

7. Ibid. p. 8.

8. 440 F.2d at 1363, fn. 1. The numbered breakdown of the claims, made by Plaintiff

in its "Statement of Position . . ." is adopted. For reasons which it is hoped will be readily apparent, claim 16 is quoted last.

mation which it is desired to store in that register,

4. means responsive to some of said pulses for producing a pattern of voltages,

5. means responsive coincidentally to said voltage combinations and said voltage pattern for selecting said register,

6. and means for storing said numerical information in said register."

Claim 23

"In an information storage system,

1. spot magnetization recording means including a plurality of registers adapted to receive numerical information and to have such information erased therefrom,

2. manually settable keyboard means at a remote position,

3. means operable cooperatively with said keyboard means to produce a group of pulses indicative of a particular register and also containing numerical information which it is desired to store in that register,

4. means responsible to said pulses for selecting said register,

5. means operable upon selection of said register for indicating whether or not any number already stored in said register plus that to be stored exceeds a given number,

6. and means operable only in the event that said given number will not be exceeded for erasing the number already in said register and for storing therein by spot magnetization the sum of the erased number and the additional number which it is desired to store."

Claim 16

"A system for magnetic storage of a plurality of data respectively relating to different items of information,

1. comprising a magnetic member having a plurality of magnetizable data storage portions respectively assignable to said different items of information,

2. a magnetic recording and reading device adjacent to said magnetic storage member for selectively magnetizing any of said data storage portions for storing data thereon or alternatively for taking a reading of data previously stored thereon.

3. means for transmitting signals including item selection signals to said storage apparatus,

4. means for causing continuous relative rotation between said magnetic storage member and said magnetic recording and reading device for continuously scanning said plurality of data storage portions,

5. circuits separately operable through said magnetic recording and reading device for causing the device to record or read as desired,

6. selective means responsive to the received signals for rendering a desired one of said circuits operable,

7. and means including a gating circuit having space discharge tubes and whose timing is controlled by the received selection signals and the instantaneous position of said recording and reading device relative to that of a data storage portion selected, thereby to effect a desired recording or reading operation." [9]

9. "The read-record timing invention was originally claimed in the application of Edwin L. Schmidt, filed May 5, 1948 and issued on February 26, 1952, as U.S. Patent No. 2,587,532 to The Teleregister Corporation, for a System for Magnetic Storage of Data. The read-record timing invention was the subject of an interference in the U.S. Patent

Plaintiff contends that the automatic reset feature is incorporated in claims 5, 19 and 23 by the "means" provisions of the following clauses:

Claim 5, clause 9:

"means at said central station responsive to said pulses for selecting said register . . . ."

Claim 19, clause 5:

"means responsive coincidentally to said voltage combinations and said voltage pattern for selecting said register . . . ."

Claim 23, clause 4:

"means responsive to said pulses for selecting said register . . . ."

It is the "means" for "selecting said register" that are called for by each of said claims, and it is the "pulses" (Claims 5 and 23) or "voltage combinations and said voltage pattern for selecting said register" (Claim 19) that constitute those "means." Certainly no warning is given that these "means" involve or incorporate an automatic reset feature, any more than that they include keys, transmission and power lines, or signal lights. Such is also the uncontroverted testimony of Defendants' expert, Dr. McDuffie.[10]

Now compare the language of claim 16, which Plaintiff contends does not include the automatic reset feature, which Commissioner Davis says "may not" be included [11] and which was stated by the Court of Claims "was found by the commissioner and is agreed by the parties to be entirely independent of the reset device . . . ." [12]

"2.  a magnetic recording and reading device . . . for selectively magnetizing any of said data storage positions . . .

alternatively for taking a reading of data previously stored thereon."

"5.  circuits . . . for causing the device to . . . read as desired."

"6.  selective means responsive to the received signals for rendering a desired one of said circuits operable."

If these do not relate to "register selection" the court's understanding of English is abysmally deficient. If these "means" do not include the automatic reset feature (as they do not in terms, and as Plaintiff asserts they do not) then it is difficult, if not impossible, to understand how representative claims 5, 19 and 23 do include such feature under the "means" language. "Means" apparently "means" only what Plaintiff "means" it to.

Some almost startling results follow.

If claim 16 does not incorporate the automatic reset feature under the "means" approach, claim 16 does not claim a "vital" element of "the" invention and accordingly is invalid.

If claim 16 does not incorporate the automatic reset feature under the "means" approach, but nevertheless *is* valid, then the automatic reset feature is not "vital" to the validity of the patent.

If claim 16 does in fact incorporate the automatic reset feature, despite Plaintiff's denial thereof, then it is impossible to give any intelligent interpretation to the claims of the patent.

If even the Plaintiff does not know what the claims mean, how can any businessman (or judge) find that they particularly point out and distinctly claim "the subject matter which the applicant

---

Office between the Sharpless-Eichert patent application and the Schmidt patent application, and priority was awarded to Sharpless-Eichert . . . ." (Plaintiff's Position . . . . p. 11).

10. Attachment 7 to Defendants' Supporting Statement for Summary Judgment Motion, pars. 5, 6, 43–47.

11. 164 USPQ 57, fn. 7.

12. 440 F.2d at 1375.

regards as his invention"? (35 U.S.C. § 112, par. 2).

■ In view of the foregoing, the court finds and holds that, because of Plaintiff's position as to the scope of the '813 patent and its "vital" elements, claims 1–15 and 17–24 are invalid, as not "particularly pointing out and distinctly claiming the subject matter which the applicant claims as his invention." (35 U.S.C. § 112, par. 2). Defendants' motion for summary judgment as to those claims is accordingly granted. For the reasons set forth above, the court *sua sponte* likewise grants summary judgment for the Defendants as to claim 16.

It thus becomes unnecessary to discuss the other contentions raised by Defendants, such as:

1. The automatic reset feature is useful only on initial start-up or in the event of a power failure; it is not necessary during continual operation.[13]

2. Other operational computers without reset features, such as ENIAC, EDVAC, UNIVAC and BINAC, were information and/or position volatile but these information-volatile devices were successfully used.[14]

3. With the January 1948 date for the '813 invention, the earliest possible if the automatic reset "vital" feature is accepted, '813 reads directly on the Eichert-Mauchly '827 patent which does not include a reset feature.[15]

4. That the register selection language of the '813 patent is sufficiently broad so that it would encompass equivalent systems directly driven from the revolving shaft of a mechanical system incapable of losing synchronization in the event of power failure.[16]

Judgment is hereby directed to be entered to the effect that claims 1–24 of the '813 patent are invalid.

---

13. McDuffie Affidavit, Attachment 7 to Defendants' Supporting Statement for Summary Judgment Motion, pars. 6–9, 32–33, 36–37.

---

14. Plaintiff's expert, Shaw, Court of Claims Transcript 3132–34.

15. McDuffie Affidavit, supra, pars. 39–42.

16. McDuffie Affidavit, supra, pars. 46–56.