## LOCKHEED AIRCRAFT CORPORATION

v.

## The UNITED STATES.

### No. 382–70.

United States Court of Claims.

March 23, 1977.

William D. Hall, Los Angeles, Cal., attorney of record, for plaintiff. Geoffrey R. Myers, Bethesda, Md., of counsel.

Steven Kreiss, Washington, D.C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, New York City.

Before COWEN, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Joseph V. Colaianni, filed April 20, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision with a

modification, as hereinafter set forth *, it hereby affirms and adopts the said decision, as modified, as the basis for its judgment in this case. It is, therefore, concluded that claims 1, 2, 4, 5 and 7 to 10 of United States Letters Patent No. 3,001,191 are valid and the inventions defined by claims 1, 2, 4, 5 and 8 to 10 have been used and/or manufactured by or for defendant without authorization or license from plaintiff, that plaintiff is entitled to recover reasonable and entire compensation therefor, and judgment is entered for plaintiff to that effect. The amount of recovery will be determined pursuant to Rule 131(c)(2).

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

Plaintiff seeks, pursuant to 28 U.S.C. § 1498, reasonable and entire compensation for the unauthorized manufacture and use by or for the Government of a radar for determining the altitude of remote objects. The patent in suit, United States Letters Patent No. 3,001,191 (hereinafter referred to as either the Richter or '191 patent), entitled "Height Finding Radio Detection and Ranging Device," issued to Elvin O. Richter on September 19, 1961, on an application filed in the United States Patent Office on March 28, 1955. Plaintiff, Lockheed Aircraft Corp., has been and continues to be the sole owner of the patent in suit. Infringement of claims 1, 2, 4, 5 and 7 to 10 is alleged.

Defendant has asserted a host of defenses to plaintiff's action, specifically: invalidity, noninfringement, license and misuse. Since no findings of fact have been proposed with respect to the misuse defense and defendant has not addressed misuse in its brief, defendant is deemed to have abandoned its assertion of misuse. *Bendix Corp. v. United States*, 186 USPQ 289 (Trial Div., Ct.Cl. 1975); *Grover v. United States*, 200 Ct.Cl. 337, 354 (1973).

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed April 20, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

The issue of accounting was, by order of the Trial Judge, deferred until after the issue of liability is finally adjudicated.

For the reasons stated hereinafter, it is concluded that claims 1, 2, 4, 5 and 7 to 10 are valid and the inventions covered by claims 1, 2, 4, 5 and 8 to 10 [1] are found to have been used and/or manufactured by or for the defendant without authorization or license from plaintiff.

### The Patent in Suit

The patent in suit relates to an airborne radar system for detecting the height, range and relative azimuth position of a target.

The system relies on the phenomena which occurs when a radar beam which has been radiated into space encounters a target. Specifically, what occurs is that the radiated energy reflected off the target within the beam will return to the radar by means of at least two paths, one directly from the target to the radar and the other indirectly from the target to the ground and ultimately to the radar. Since the ground-reflected return energy will travel a further distance than the direct energy, it will arrive at the radar a short time after the directly reflected energy.

By measuring the path length or time difference between the direct and indirect ground-reflected energy, Richter was able to determine target height according to the relationship

$$h_2 = \frac{\triangle TR_S}{2h_1}$$

wherein $h_2$ is target height
$h_1$ is radar or own aircraft altitude
$R_S$ is slant range between own and target aircraft
$\triangle T$ is path length or time difference

The patented device is designed to measure range and time or path length difference and, through the use of these parameters as well as own aircraft altitude, determine target height according to the above

1. Claim 7 is found to be not infringed for reasons stated more fully hereinafter.

relationship. A correction for the earth's curvature can be inserted into the above relationship.

Generally speaking, the patented system includes a transmitter for generating electromagnetic energy pulses, which are conveyed through an amplifier and duplexer to an antenna having a narrow beam in the azimuth or horizontal direction relative to the earth's surface and a wide beam in the elevation or vertical direction. Energy reflected from a target within the radar beam will return via the two paths described above to the antenna. Appropriate circuitry operates on the return pulses to generate both range and time difference voltages.

The output voltages representing range and time difference are fed to a computer which also receives a voltage corresponding to radar altitude from an altimeter, and target height is computed as a function of these three parameters.

The system also contain elements for indicating target azimuth position and for correcting the target height computation for the earth's curvature.

### Validity

Turning now to a consideration of each of defendant's defenses, attention is initially directed to its validity defense.

Claim 1, representative of the breadth of invention claimed, reads as follows:

1. A radar device for determining the altitude of a remote object comprising, antenna means, transmitting means for directing electromagnetic energy through said antenna means and toward the remote object, receiving means connecting with said antenna means and being responsive to the electromagnetic energy reflected by the remote object from two energy paths, one path being on a direct line of sight between the antenna means and the remote object and the other path being indirect from the object to the antenna means via a reflection off the surface of the earth, detector means coupled with said receiver means and measuring the time difference in receipt of the energy from the two paths, means responsive to both the transmitted and received energy and providing an output representing the range of the remote object, and means responsive to the output from said detector means and said last mentioned means for determining the height of the remote object.

Prior to plaintiff's invention, and stretching back at least to World War II, it was necessary to utilize a first radar device to search a large sector of space for aircraft and a second radar to determine the height of the aircraft within the sector searched. However, by the use of plaintiff's invention, a single radar is now capable of simultaneously searching a large sector of space and determining the height of an object within that sector.

The invention includes a height and range finding radar having an antenna through which a transmitter directs electromagnetic energy, a receiver responsive to the electromagnetic energy returning to the radar from a target via direct and ground-reflected paths, a detector for measuring the time difference between receipt by the receiver of the direct and ground-reflected energy, means providing for an output of target range in response to transmitted and received energy, and means determining target height in response to parameters such as target range ($Rs$) and time difference ($\triangle T$).

The patent specification goes on to emphasize the necessity of own aircraft altitude in carrying out a height computation operation by the following language:

The $\triangle T$ voltage, in combination with a voltage Rs representing the measured range (slant range) of the remote object, and a voltage $h_1$ representing the altitude of the height finder radar platform 16, provides the necessary information for computing the altitude of the remote object. These three voltage inputs to the computer are operated on to provide a solution * * *

Defendant contends that the claims in issue are invalid under 35 U.S.C. §§ 102(a),[2] 102(g),[3] and 103. Specifically, it is urged that a paper written by David E. Sunstein on UHF airborne height finding radar is prior public knowledge and anticipates the claimed invention under 35 U.S.C. § 102(a). In addition, defendant argues that work done by Messrs. Leopard and Hair on a Navy project, as well as a lobe counting technique developed at MIT Lincoln Laboratory, are both prior inventions and anticipate individually the claimed invention under 35 U.S.C. § 102(g). Finally, defendant contends that the prior art collectively renders the claimed invention obvious within the meaning of 35 U.S.C. § 103. For reasons which follow, each of these contentions is found to be unsound and accordingly rejected.

The Sunstein paper, which bears a date of November 15, 1954, was a classified document[4] which disclosed a target height finding system based on the three parameters of target range, path length difference and own altitude. Defendant urges that, despite its classified status, the circumstances surrounding and the manner of distribution of the Sunstein paper render it "public" prior knowledge within the meaning of 35 U.S.C. § 102(a). On the other hand, plaintiff argues, *inter alia*, that the Richter invention was conceived prior to the effective date of the Sunstein paper, diligently reduced to practice and that the Sunstein paper accordingly is not a prior art teaching under the statute.

Addressing plaintiff's argument first, it is well established that the burden of proof of an inventor's alleged conception and reduction to practice is a heavy one requiring full corroboration by other than the inventor's own self-serving testimony or records. *Potter Instrument Co. v. ODEC Computer Systems, Inc.*, 370 F.Supp. 198, 206, 181 USPQ 572, 577 (D.C.R.I.), *aff'd*, 499 F.2d 209, 182 USPQ 386 (1st Cir. 1974). In fact, this court has held that oral recollections of long past events, unsupported by contemporaneous documentary evidence, are insufficient to meet the strict burden of proof required. *Perry v. United States*, 76 F.Supp. 503, 112 Ct.Cl. 1 (1948).

The evidence surrounding the conception and reduction to practice of the Richter height finding invention is fully set forth in the findings. Suffice it to say that the oral testimony of the inventor, Elvin Richter, and the attorney who prepared and prosecuted the Richter patent application, Billy Corber, coupled with the contemporaneous documentary evidence of record, is sufficient to establish that Richter conceived his height finding invention at least as early as October 28, 1954, and exercised reasonable diligence from that date until the filing of a patent application on the invention on March 28, 1955.

It is therefore concluded that the Sunstein paper of November 15, 1954, is not prior art with respect to the Richter invention.[5] *See In Re Stempel*, 241 F.2d 755, 760, 44 CCPA 820, 113 USPQ 77, 81 (1957).

2. "§ 102. Conditions for patentability; novelty and loss of right to patent.

"A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or"

3. "(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive

and last to reduce to practice, from a time prior to conception by the other."

4. The Sunstein paper was declassified on December 31, 1960, which is long after the March 28, 1955, filing date of the Richter application.

5. On this basis, it is not necessary to decide whether the Sunstein paper is "public" as 35 U.S.C. § 102(a) has been interpreted to require. It is nevertheless noted that defendant's position regarding the public nature of the Sunstein paper is not supported by precedent. *See, e. g., Simmonds Precision Products, Inc. v. United States*, 153 USPQ 465 (Trial Div., Ct.Cl.1967), 183 Ct.Cl. 969 (1968); *Connecticut Valley Enterprises, Inc. v. United States*, 348 F.2d 949, 172 Ct.Cl. 468 (1965).

Defendant urges next that the work of Messrs. Leopard and Hair anticipates the Richter invention under 35 U.S.C. § 102(g) as a prior invention. This contention is unmeritorious, however, for the simple reason that the radar of Leopard and Hair is a passive range finding radar which is not ·substantially identical to the structure of the claimed system since, at the very least, it does not have any transmitting circuits. This is a sufficient distinction to dispose of defendant's argument as it is necessary for a teaching, to anticipate an invention under 35 U.S.C. § 102, to show each and every element of the claimed combination. *Tate Engineering, Inc. v. United States*, 477 F.2d 1336, 201 Ct.Cl. 711 (1973); *Decca, Ltd. v. United States*, 420 F.2d 1010, 190 Ct.Cl. 454, cert. denied, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970); *Straussler v. United States*, 339 F.2d 670, 168 Ct.Cl. 852 (1964).

Defendant's contention fails for the equally persuasive reason that the burden of proof required to establish a prior invention has not been met.[6]

Just as an inventor such as Richter faces a heavy burden in proving his conception and diligence, it is generally recognized that prior invention, use or knowledge, imposes on the party asserting it the requirement of clear and satisfactory proof beyond a reasonable doubt. *Carboline Co. v. Mobil Oil Corp.*, 301 F.Supp. 141, 146, 163 USPQ 273, 278 (N.D.Ill.1969); *Meurer Steel Barrel Co. v. United States*, 74 Ct.Cl. 428, 13 USPQ 127 (1932), cert. denied, 302 U.S. 754, 58 S.Ct. 280, 82 L.Ed. 583 (1937); *The Barbed Wire Patent*, 143 U.S. 275, 284–5, 12 S.Ct. 443, 36 L.Ed. 154 (1892).

Indeed, the oral testimony of witnesses, speaking only from memory in regard to past transactions has, in the absence of contemporaneous documentary or physical evidence, consistently been found to be of little probative value. *Food Machinery Corp. v. Pacific Can Co.*, 66 F.Supp. 109, 70 USPQ 474 (N.D.Calif.1946); *Noma Electric Corp. v. M. Goldman & Co.*, 60 F.2d 579, 14

USPQ 88 (D.Conn.1932). Such uncorroborated testimony is insufficient to show anticipation, within the meaning of 35 U.S.C. § 102, of an issued patent. *Montgomery v. United States*, 65 Ct.Cl. 526 (1928).

In the present case, the evidence of record consists of the testimony of the two inventors and one of their co-workers, William McMurran, all employees of defendant. Further, the documentary evidence consists largely of hearsay, recorded 5 to 6 years after the alleged events.

The uncorroborated testimony of prior inventors or users should be evaluated with particular caution, *see Carboline, supra*, 301 F.Supp. at 146–48, as should the oral testimony of an employee of a party to the litigation, recollecting events long past. *Aqua-Chem, Inc. v. Baldwin-Lima-Hamilton Corp.*, 167 USPQ 257, 267 (N.D.Ill.1970), and cases cited therein.

Under these circumstances, it is concluded that the invention of Leopard and Hair, even assuming, *arguendo*, the presence therein of all the structural elements found in the Richter claims, has not been satisfactorily proven to have been conceived prior to Richter's conception and constructive reduction to practice.

Turning now to the question of obviousness under 35 U.S.C. § 103, it is hornbook law that the claims measure the invention and a resolution of the obviousness of an invention must be based on what is claimed. *Douglas v. United States*, 510 F.2d 364, 206 Ct.Cl. 96, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975). In determining the obviousness or nonobviousness of an invention, the scope and content of the prior art is to be determined, the differences between the claims and the prior art are to be ascertained and the level of ordinary skill in the pertinent art is to be resolved. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

It was known in the prior art, prior to the conception of the Richter invention, that an

---

**6.** In this instance although a patent on the Leopard and Hair invention was not filed in the Patent Office until May 19, 1959, defendant nonetheless maintains that the joint invention was conceived on or about October 15, 1953.

electromagnetic wave or pulse signal transmitted from a radar device would reflect off an object within its path and return to the radar. Distance, or range, from the radar to the object was conventionally measured by observing the time lapse between transmission and receipt of the return signal.

The use of particular receivers for reception of the return signals was also well known. For example, it was known that since the bandwidth of a receiver is inversely proportional to its response time, a wide band receiver, one that accepts a wide band of frequencies, has a short period of response and faithfully reproduces the shape of a signal. However, the signal to noise ratio of such a receiver is poor and noise level equals signal level. Conversely, a narrow band receiver, which accepts only selective frequencies, provides a distorted signal shape but has a reduced noise level and thus increases range capability since weaker signals can be detected in the reduced noise level. When receiver bandwidth and transmitter frequency are matched, i. e., when bandwidth is the reciprocal of transmitted signal wavelength, the signal to noise ratio is optimized.

It was also known that radar signals are transmitted, by way of an appropriate antenna, to an object by at least two paths, one directly to the object and another indirectly from the radar to the earth's surface to the object.

In fact, German Patent No. 672,303 which issued to Mr. Hans Schuchmann, on March 1, 1939, shows a passive system for determining the range of an object by measuring at a receiving aircraft the time difference between receipt of the direct and ground-reflected signals transmitted from the object. Range is computed according to the same intrinsic relationship used by Richter. Schuchmann's system utilized an oscilloscope to measure time difference but depended upon a knowledge of the altitude of the target aircraft as well as the receiving aircraft. The system was thus ineffective for determining the range of truly unknown aircraft.

The range equation utilized by Schuchmann is based upon the geometry of two aircraft in relation to the earth's surface and defines the mathematical relationship between target height, own height, target range and time or path length difference.

The time difference between the receipt of the direct and indirect signals, in the Schuchmann system, is a function of the path length difference and the speed of propagation of the signals. Since the indirect signal travels a farther distance than the direct signal, it will arrive at the receiving station a short time after the direct signal.

The work of Mr. Robert H. Dicke must also of necessity be considered and mentioned in any realistic attempt to evaluate the state of the art at the time of the Richter invention. Mr. Dicke was concerned with being able to understand and decipher the response received when two objects are within the same radar beam, since the return signals may in such a situation be received as overlapping signals. As a result, Mr. Dicke developed a system for separating overlapping signals to enable a better analysis of the return signals and improve the accuracy of the system's results. In operation, the Dicke system modulates the transmitted radar signals of a conventional radar and subjects the return signals to pulse compression, and, as a result, long duration overlapping pulses are separated into short duration distinct signals. Unites States Letters Patent No. 2,624,876 was granted to Dicke on January 6, 1953.

Another prior art radar system relevant to a 35 U.S.C. § 103 analysis is described by United Kingdom Patent No. 588,763, issued June 3, 1947, to Mr. Otto M. Bohm. Mr. Bohm developed a system for measuring target height, known as the signal comparison system, which utilized the same geometric relation as Richter's invention, but in terms of target range and angle of elevation between two aircraft. The angle of elevation is functionally related to the time difference between receipt of direct and ground-reflected signals. Range was meas-

ured by conventional radar equipment. Bohm determined that radar receivers mounted at different heights exhibited varying field strengths upon receipt of radar pulse return signals, the ratio of which equaled angle of elevation. Using target range and angle of elevation, target height could be calculated. The Bohm patent was considered by the Patent Office examiner during his evaluation of the Richter application.

The signal comparison system of Bohm was acknowledged by Louis N. Ridenour in his book on radar systems, published in 1947.[7] The Ridenour text also disclosed a second method of height finding termed null counting, or lobe counting as it was later known.

In the lobe counting method, when a radar beam reflects energy off the ground, a secondary elevation lobe pattern of maxima and minima energy lobes is produced, as shown, for example, in finding 34.

As explained in the Ridenour text, if the lobe pattern is known, the height of the target can be estimated from the range of first appearance of a target in the lobe pattern. This system has inherent drawbacks which detract from its accuracy, as fully enumerated in finding 35.

This was the state of the pertinent prior art when Richter developed his height finding radar in late 1954.[8]

The individual elements, i. e., the various electronic circuits, cathode ray tubes, etc., from which Richter developed his height finding and search radar were well known at the time of his invention, as is the case in virtually all inventions involving a combination of elements. The claims of the patent define an overall combination of elements to determine range and target height and it is this combination which must be viewed as a whole in arriving at a determination as to the patentability of the claimed subject matter. See Tate Engineering, Inc. v. United States, 166 USPQ 329, 335 (Trial Div.Ct.Cl.), 193 Ct.Cl. 1088 (1970).

A comparison of the claimed combination and the prior art reveals several basic differences, fundamental to which is the concept of using means in combination with a conventional range radar system for the direct measurement of time difference between receipt of direct and ground-reflected radar signal pulse echoes from a target for use in calculating target height. It is concluded that this difference alone renders the claims valid.

Theoretically, the relationship between target range, target height, radar height and time difference was known in the art years prior to the Richter invention. Indeed many of the prior art systems were based on this geometrical relationship. It is concluded, however, that the prior art in no way suggests, either expressly or impliedly, the use of a direct measurement of time difference between direct and ground-reflected signal echoes in combination with a conventional radar range system for additionally determining target height. A combination of old elements to produce a new and useful result is patentable. Saulnier v. United States, 180 F.Supp. 412, 148 Ct.Cl. 507, cert. denied, 363 U.S. 829, 80 S.Ct. 1601, 4 L.Ed.2d 1525 (1960); Zonolite Co. v. United States, 149 F.Supp. 953, 138 Ct.Cl. 114 (1957); Badowski v. United States, 140 F.Supp. 544, 135 Ct.Cl. 93 (1956).

Several factors compel this conclusion. Prior to the Richter invention, MIT's Lincoln Laboratory was conducting classified studies on behalf of the United States into the feasibility of lobe counting as a height finding method. Several reports, declassified subsequent to the issuance of the Richter patent, disclose the nature of the

7. Radar System Engineering, McGraw Hill Book Co., 1947.

8. Richter conceived his invention at least as early as October 28, 1954, as fully explained supra. Thus, the Sunstein paper, dated November 15, 1954, and a patent to Lester D. Van Valkenburgh, U.S. Patent No. 2,837,738, described in findings 22–25, even if it be accorded a date of conception of February 9, 1955, as urged by defendant, are not part of the pertinent prior art with respect to the Richter invention.

lobe counting technique, explained in detail by defendant's expert, Jerome Freedman.

■ It is clear that these reports, classified at the time the Richter patent issued, are not prior art within the meaning of 35 U.S.C. §§ 102 or 103. *Stamicarbon, N. V. v. Escambia Chemical Corp.*, 300 F.Supp. 1209, 1215, 160 USPQ 815, 821 (N.D.Fla.1969), *aff'd*, 430 F.2d 920 (5th Cir. 1970), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248; *Carboline, supra* ; *Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc.*, 298 F.2d 36, 38, 131 USPQ 402, 404 (7th Cir. 1961).

Nevertheless, such classified reports are indicative of the general level of skill in the art. *Del Mar Engineering Lab. v. United States*, 524 F.2d 1178, 207 Ct.Cl. 815 (1975); *Simmonds Precision Products, Inc. v. United States*, 153 USPQ 465, 468 (Trial Div., Ct.Cl.1967), 183 Ct.Cl. 969 (1968); *Servo Corp. of America v. General Electric Co.*, 337 F.2d 716, 720, 143 USPQ 85, 88 (4th Cir. 1964), *cert. denied*, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966).

In the lobe counting technique developed by MIT there is a unique rate of lobes per mile which a target will traverse as a function of any given target range and height. A lobe is the term used to identify each finger-like maxima in the elevation lobe pattern. Choosing a radar height, graphs representing lobes per mile versus target range were computed at Lincoln Lab for various known target heights and ranges, thus yielding graphs showing a family of target height curves. *See* finding 36. Having computed these graphs for selected target heights and ranges, the target height of an unknown object could then be estimated by observing the number of lobes per mile traversed by a target on an oscilloscope, measuring the target range and then finding the target height from the graphs as the point of intersection of the observed coordinates.

The accuracy of the computed graphs was tested at Lincoln Lab using a newly-developed UHF AEW radar. While the theoretical derivation of the lobe counting graphs involved the rate of change of time difference, it does not utilize a time difference measurement in its calculation. Moreover, the newly-developed radar hardware at Lincoln Lab amounted to no more than an obvious combination of electronic equipment, as conceded by defendant.[9]

Thus, at the time Richter conceived his invention, highly trained radar personnel at MIT's Lincoln Laboratory were using a conventional radar in conjunction with graphs which had been laboriously and tediously produced over a period of several months to establish the height of target aircraft. Where, as in the instant case, it is shown that the idea of the invention was not apparent to persons who were trained and skilled in the particular art to which it relates, and familiar with the type of apparatus which the invention involves, it may be concluded that Richter's invention was not obvious to the ordinary man skilled in the art. *Olsson v. United States*, 72 Ct.Cl. 72 (1931).

Further evidencing the unobviousness of Richter's height finding radar is the long-felt need for a combined search and height finding radar, dating at least as far back as the Second World War, and the failure of others to provide a satisfactory solution. *Blumcraft of Pittsburgh v. United States*, 372 F.2d 1014, 178 Ct.Cl. 798 (1967); *Graham v. John Deere Co., supra.*

■ It is therefore concluded that claims 1, 2, 4, 5 and 7 to 10, the claims in issue, are valid.

*Straussler v. United States*, 339 F.2d 670, 168 Ct.Cl. 852 (1964). This assumes, *arguendo*, that such classified material can form the basis of a § 102(g) prior invention. *See Del Mar Engineering Lab v. United States*, 524 F.2d 1178, 207 Ct.Cl. 815 (1975).

9. Since lobe counting utilized prior art hardware in a conventional and well-known manner, it does not disclose plaintiff's patented combination and thus defendant's contention that the MIT Lincoln Lab lobe counting anticipates the Richter claims as prior invention under 35 U.S.C. § 102(g) is unmeritorious.

### Infringement

The accused device is the AN/APS–96 radar set used by the Navy in its Model E–2A Hawkeye aircraft. Briefly, the accused device is characterized by a coherent master oscillator that generates fixed-frequency electromagnetic pulses which, after pulse expansion, frequency conversion, amplification and modulation, are radiated into space by a highly directional antenna having a wide elevation beam and a narrow azimuth beam. The device has receiving circuits for reception of return pulses from a target object which include pulse compression circuits, as described in the findings, for separation of the direct and ground-reflected return pulses.

An association control and range accumulator are responsive to the transmitting and receiving circuits so as to detect target range while a height counter detects time difference in response to the direct and ground-reflected return pulses. Time difference and target range are fed as digital signals to a digital computer, along with a signal representative of own aircraft altitude, and the computer calculates target height, which is suitably displayed for use by a computer indicator group. The accused device operates automatically and requires no manual operations.

 In determining the question of infringement, it has long been established that the claims of a patent define the metes and bounds of an invention and must be looked to in determining if there has been infringement. *Strumskis v. United States,* 474 F.2d 623, 200 Ct.Cl. 668, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Badowski v. United States,* 164 F.Supp. 252, 255, 143 Ct.Cl. 23, 27 (1958). However, the scope and breadth of the claimed subject matter must necessarily be established before the question of infringement can be resolved. *Tate Engineering, Inc. v. United States,* 477 F.2d 1336, 201 Ct.Cl. 711 (1973).

 It is a corollary of the above that while the specification and drawings of a patent may lend aid in interpreting the claims, *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391 (1967), rehearing denied, 184 Ct.Cl. 801 (1968), the claims of a patent are not limited in scope to the best mode for practicing the invention or to any particular mode for practicing the invention that is described in the specification or drawings. *National Dairy Products Corp. v. Swiss Colony, Inc.,* 364 F.Supp. 134, 176 USPQ 405, 419 (W.D.Wis. 1972). With these guidelines in mind, and having considered the file history of the Richter patent application as well as the evidence presented at trial that was not before the Patent Office, it is concluded that the claims of the Richter patent should not be construed within a narrow compass but, rather, should be accorded a broad and liberal interpretation so as to cover a reasonable range of equivalent devices performing substantially the same work in substantially the same manner to achieve substantially the same results as the claimed system read in light of the disclosed modes.

 Other factors dictate such a conclusion. Defendant's expert witness considered the MIT lobe counting work to be the closest teaching to the patented invention. Yet, this work reveals a height finding system utilizing a conventional combination of electronic elements at the time Richter developed his height finding system. Such an approach was developed by trained personnel at MIT Lincoln Lab as a solution to the longstanding need for a single radar capable of both search and height finding functions. A patent should be accorded a liberal interpretation where it discloses not just an improvement in existing equipment, but rather a different route yielding a basic solution to a long-existing problem. *Maschinenfabrik Rieter A. G. v. Greenwood Mills,* 340 F.Supp. 1103, 173 USPQ 605 (D.C.S.C.1972).

 Having determined that the claims in issue are entitled to a broad range of equivalents, the claims must next be read upon the accused device. As fully set forth in the findings, using claim 1 as a repre-

sentative claim, it is clear that claim 1 literally reads on the accused device. The inquiry continues, however, for the accused device must additionally be shown to substantively infringe the claims by performing the same work, in substantially the same manner to achieve substantially the same result as the claimed device. *Autogiro, supra,* 384 F.2d at 400, 181 Ct.Cl. at 67.

Defendant points to the following four structural distinctions between the claimed and accused devices as conclusive proof of their nonequivalency:

1. the use of two separate receivers in the claimed device, specifically, a broad band receiver for time or path length difference and a narrow band matched receiver for range, versus the use of a single receiver with pulse compression filters in the accused device;

2. the use of a fixed-frequency electromagnetic pulse in the claimed device versus the use of frequency-modulated pulses in the accused device;

3. the manual detection of time or path length difference after receipt in the claimed device versus the automatic detection thereof in the accused device; and

4. means responsive to range and time difference for determining target height in the claimed device (claims 1, 2, 8, 9, 10) versus means responsive to range, time difference and own altitude for determining target height in the accused device.

It is concluded, for reasons which follow, and as more fully set forth in the findings of fact, that, despite these contentions, the accused device infringes the invention claimed.

Each of defendant's contentions will now be fully considered with attention being initially directed to its fourth asserted distinction.

Claim 1 recites, in pertinent part:

* * * means responsive to the output from said detector means [time differ-

ence output] and said last mentioned means [range output] for determining the height of the remote object.

First, it should be pointed out that the clause is not of closed construction. It does not recite means responsive *only* or *solely* to range and time difference. outputs, but merely expressly requires at least those two factors. The clause thus covers or embraces an element such as the height coordinate computer of the accused device, which responds to range, time difference and own altitude for height computation.

■ However, more to the point, the Supreme Court in *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917), stated that:

The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification.

This guideline was recently repeated by the Supreme Court in *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966), when it announced:

* * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention, * * *

The above clause comprising as it does a means plus a statement of function, is governed by 35 U.S.C. § 112, para. 3. That paragraph provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

While it is thus essential in clauses which utilize "means" clauses to look to the specification to establish the structure covered thereby, it is also imperative that para. 2 of

35 U.S.C. § 112,[10] which requires that the claims of a patent particularly point out and distinctly claim the subject matter that the applicant regards as his invention, not be totally ignored.

When faced with exactly the same question, the court in *Technitrol, Inc. v. Contrc! Data Corp., et al.,* 394 F.Supp. 511, 185 USPQ 801 (D.C.Md.1975), correctly concluded that a "means plus function" claim covers the structure necessary to perform the specified function.

 Accordingly, it is fitting and proper to look to the specification in interpreting the claims of the patent in suit and this is so even if such a review results in a narrower interpretation of the claims that the broad means plus function clauses of the claims would at first indicate. *Roberts Dairy Co. v. United States,* 530 F.2d 1342, 208 Ct.Cl. 830 (1976).

In the present case, defendant argues that the above-quoted language of claim 1 indicates that range and time difference voltages are the *only* inputs required by a computer to calculate the height of the remote object. However, a careful review of the specification and drawings of the patent clearly indicates that additional inputs are necessary for the computer to make the desired target height calculation. Specifically, Fig. 1 of the drawings shows that an altimeter 51 supplies the required altitude of the radar carrying aircraft to the computer shown schematically by block 3.

Moreover, in describing the Fig. 1 schematic, the patentee states:

Referring to FIGURE 1 it is seen that the height finding radar device of this invention includes a basic radio detection and ranging unit 1, a delta range detection unit 2, an altimeter 51 and a computer 3. The computer is responsive to the delta range detection unit 2, the basic radar unit 1 and the altimeter device 51 for computing the altitude of a remote object located within the search field of the radar device.[11]

Further evidence of the necessity of own aircraft altitude in making the height calculations of a target aircraft is found at lines 5 to 11 of col. 7, whereat is found:

The $\triangle T$ voltage, in combination with a voltage Rs representing the measured range (slant range) of the remote object, and a voltage $h_1$ representing the altitude of the height finder radar platform 16, provides the necessary information for computing the altitude of the remote object. These three voltage inputs to the computer are operated on to provide a solution to the following equation:

$$h_2 \cong \frac{\triangle TR_S}{2h_1}$$

Thus it is clear that the computer 3 of Fig. 1 requires the presence of voltage inputs representing range, time difference and own aircraft altitude before it can solve the basic equation that defines the height of the target aircraft.

As a result of these statements in the specification and the disclosure shown in Fig. 1 of the drawings, and in the interest of determining the true meaning of the claims, it is concluded that the height determining means of the claims of the patent in suit require at the very least inputs of range, time difference and own aircraft altitude. See *Autogiro, supra,* 384 F.2d at 397–8, 181 Ct.Cl. at 63–4, where this court indicated that the specification needs to be looked to as the concordance for the claims.

Accordingly, defendant's noninfringement argument based on its fourth structural distinction between the accused device and the claimed invention must be rejected.

10. "§ 112. Specification.

 * * * * * *

"The specification shall conclude with one or more claims partic...arly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. A claim may be written in independent or dependent

form, and if in dependent form, it shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim."

11. *See* bridging paragraph beginning at line 16, col. 2, and terminating at line 2 of col. 3.

With respect to the second and third differences, claim 1 recites, in pertinent part:

* * * transmitting means for directing electromagnetic energy through said antenna means and toward the remote object, * * *

* * * detector means coupled with said receiver means and measuring the time difference in receipt of the energy from the two paths, * * *

The transmitting means is not limited to fixed or modulated frequency and the detector means is not limited to manual or automatic detection. Further, looking to the specification, it is clear that both fixed and modulated frequency,[12] as well as manual or automatic detection,[13] are specifically disclosed alternatives and equivalents. In sum, the differences listed above are, in fact, not differences at all, as the specification clearly contemplates either form. Provision in the accused device for frequency modulation and automatic detection thus does not avoid infringement.

Finally, addressing defendant's first alleged distinction, it should be noted that claim 1 recites in pertinent part:

* * * receiving means connecting with said antenna means and being responsive to the eltromagnetic energy reflected by the remote object from two energy paths, one path being on a direct line of sight between the antenna means and the remote object and the other path being indirect from the object to the antenna means via a reflection off the surface of the earth, * * *

* * * means responsive to both the transmitted and received energy and providing an output representing the range of the remote object, * * *.

These elements are recited in "means plus function" terminology, and, as explained hereinabove, where a claim sets forth a means for performing a specific function, without reciting any specific structure for performing that function, the structure disclosed in the specification must be considered, and the patent claim construed to cover both the disclosed structure and equivalents thereof. The receiving means of claim 1 corresponds with the broad band height finding receiver illustrated in the specification while the range means corresponds with conventional radar range equipment set forth in the specification. Thus claim 1 defines a system including these specifically disclosed elements and equivalents thereof.

To establish infringement, it is next necessary to consider whether the use of pulse compression, which requires frequency modulation, is the equivalent of Richter's use of a broad band height finding receiver and a range detection receiver.

As more explicitly set forth in the findings, the pulse compression circuits of the accused device and the broad band height finding receiver exemplified in the Richter patent function in substantially the same manner to achieve substantially the same result within the context of the height finding radar. Specifically, both elements effectively process the return pulses for generating an output representative of the time difference in receipt of the first two return pulses. While the particular mechanism of the two elements has distinguishing features, these are not such as to vitiate the equivalency of their functioning within the overall combination.

It has often been said that a useful guide in adjudging the equivalency between a claimed and an accused device is whether persons reasonably skilled in the art would have known of the interchangeability of a part in the accused device with one in the claimed device. *Jamesbury Corp. v. United States*, 518 F.2d 1384, 207 Ct.Cl. 516, 153 U.S.P.Q. 672 (1975); *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), or would have treated elements or parts as equivalents. *Tektronix, Inc. v. United States*, 445 F.2d 323, 195 Ct.Cl. 53 (1971).

---

12. *See* lines 30–3 of col. 8 of the patent in suit.

13. Col. 8, lines 67–74; col. 9, lines 58–63.

Stated otherwise, equivalency is established where a person reasonably skilled in the art would have known of the interchangeability of an ingredient not disclosed in the patent with one that was. *Adams v. United States*, 330 F.2d 622, 165 Ct.Cl. 576 (1964), aff'd, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

This is particularly apropos to the facts of this case, where the expert witnesses of both parties have indicated that theoretically it would have been obvious to one of ordinary skill in the art, at the time Richter developed his invention, to use pulse compression and frequency modulation as a substitute for the fixed frequency and broad band height finding receiver illustrated by Richter in his specification.

Defendant argues against equivalency by pointing out that, in practical operation, the broad band receiver is an effective height finding receiver out to a range of about 70 miles whereas pulse compression allows effective height finding as far out as 180 miles. This is a variance to note, but it is nevertheless universally accepted that infringement is not avoided simply because an accused device constitutes an improvement of the claimed invention. *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.*, 363 F.Supp. 1298, 179 USPQ 527 (E.D.Mich.1973); *Amerace Esna Corp. v. Highway Safety Devices, Inc.*, 330 F.Supp. 313, 171 USPQ 186 (N.D.Tex.1971); *Edoco Technical Products, Inc. v. Peter Kiewit Sons' Co.*, 313 F.Supp. 1081, 165 USPQ 207 (C.D.Calif.1970); and *Eastern Rotorcraft Corp. v. United States*, 397 F.2d 978, 184 Ct.Cl. 709 (1968).

Particularly convincing in the present case is the fact that the concept of pulse compression for separation of overlapping pulses was well known in the prior art before the development of Richter's invention. This is shown by reference to the Dicke patent which issued on January 6, 1953, long before the October 28, 1954, conception date of Richter. Equivalency may be shown by the prior art. *Tate, supra*, 477 F.2d at 1345, 201 Ct.Cl. at 727; *American Technical Machine Corp. v. Caparotta*, 339

F.2d 557, 144 USPQ 115, 117 (2d Cir. 1964), cert. denied, 382 U.S. 842, 86 S.Ct. 65, 15 L.Ed.2d 83 (1965). Thus, the "improved equivalent," *i.e.*, pulse compression, was available to those of ordinary skill in the art for use of Richter's invention when developed.

Defendant argues further that no one in the radar art was familiar with or even knew about pulse compression in 1954. Indeed, it appears that the radar personnel at Lincoln Lab were unfamiliar with pulse compression. Richter, while he had heard about it, was likewise unfamiliar with the concept. Regardless, prior art is prior art, and is presumptively known to the hypothetical man skilled in the art, even though its teachings are not generally known in the industry to which it relates. *See, e.g., Texas Co. v. Globe Oil & Refining Co.*, 112 F.Supp. 455, 493, 98 USPQ 312, 342 (N.D.Ill. 1953), aff'd, 225 F.2d 725, 106 USPQ 392 (7th Cir. 1955).

Finally, defendant argues that since Richter knew about pulse compression in 1954, but did not incorporate it expressly into his invention and never discussed it with his attorney for incorporation into the patent application, nonequivalency can be concluded.

Defendant's position is overstated. When asked about pulse compression at trial, Richter responded:

> No. I had heard of pulse compression. It was a subject that was faintly moving around in the industry. People were working on it. I was not personally familiar with it; I just knew that it was a thing that would some day come along because people were working on it.

It is, of course, fundamental that a patentee need disclose only the best mode conceived by him for practicing the invention, not all conceivable modes. *Jack Winter, Inc. v. Koratron Co.*, 375 F.Supp. 1, 181 USPQ 353 (N.D.Calif.1974). To require otherwise would place an unreasonable burden on the patentee, a burden not required by 35 U.S.C. § 112. Richter was not "per-

sonally familiar" with pulse compression in 1954 and the patent in suit appropriately reflects what he conceived to be the best mode at that time. This does not vitiate equivalency. It has long been settled that infringement is not avoided by an equivalent that was not known at the time of the invention. WALKER ON PATENTS, § 415 (1917 and 1929 eds.); *Diamond Int'l Corp. v. Maryland Fresh Eggs, Inc.*, 374 F.Supp. 1223, 182 USPQ 147 (D.C.Md.1974); *Waterproof Insulation Corp. v. Insulating Concrete Corp.*, 153 F.Supp. 626, 114 USPQ 265 (D.C.Md.1957).

In view of the above, it is concluded that claim 1 reads literally and substantively on the use of pulse compression for time difference measurements.

Continuing, the use of two matched receivers versus a single matched receiver as in the accused device is clearly seen to be equivalent since it becomes merely a matter of preference as to whether the return pulses are received by a single matched receiver and then separately processed for range and time difference detection (as in the accused devices) or received by two separate receivers (a range receiver and a broad band receiver) and separately processed. Ultimately, after initial reception, the two systems both derive range and time difference separately. The use of a single means to perform the same function in the same manner as two separate means does not avoid infringement. *Blohm & Voss AG v. Prudential-Grace Lines, Inc.*, 346 F.Supp. 1116, 174 USPQ 484 (D.C.Md.1972), *rev. on other grounds*, 489 F.2d 231 (4 Cir. 1973); *Apex Electrical Mfg. Co. v. Maytag Co.*, 122 F.2d 182, 50 USPQ 90 (7th Cir. 1941), *cert. denied*, 314 U.S. 687, 62 S.Ct. 297, 86 L.Ed. 549.

In sum, plaintiff has established infringement of claims 1, 2, 4, 5 and 8 to 10 of the Richter patent by the accused Navy radar AN/APS-96.[14]

*License*

In addition to the defense of noninfringement, defendant also contends that it has acquired a royalty-free license to use the invention described in the Richter patent. Attention is now directed to defendant's contention of being licensed under the patent in suit as a result of certain provisions in Navy contract NOas–52–1041–c (hereinafter the 1041–c contract) between Lockheed and the Department of the Navy, and certain amendments made thereto. To address defendant's proposition first requires a short history of the evolution of the 1041–c contract.

During the early '50s, the Navy's WV-2 aircraft had an AN/APS-45 height finding radar mounted in a radome on top of the fuselage and an AN/APS-20B search radar mounted in a radome under the fuselage. Lockheed entered into the 1041–c contract with the Department of the Navy on June 28, 1952, for the primary purpose of solving an existing problem of ice accumulation on the upper and lower radomes, as well as on the nose of the aircraft, since such accumulation had an adverse effect on radar performance.

Over the next two years, work proceeded under the 1041–c contract, which was amended several times, on the design, development, ground and flight testing of deicing provisions for the WV-2 aircraft. By mid-July of 1954, Lockheed had submitted a summary report of its work to the Bureau of Aeronautics (hereinafter BUAER).

Meanwhile, Lincoln Laboratory was conducting Project Lincoln, which included the development of a UHF search radar to be eventually used on the WV-2 aircraft. Lockheed was aware of this project and, by conference letter of April 7, 1954, to BUAER, proposed a six-phase research and development program for a radome-antenna assembly to be used for mounting the UHF search radar on top of the WV-2.

14. As explained fully in finding 85, claim 7 specifically recites that the transmitted pulses are fixed frequency and the $\triangle T$ receiver is a broad band receiver. Since neither of these elements are found in the AN/APS-96, claim 7 of the Richter patent is not infringed thereby. A claim-by-claim infringement analysis of the remaining claims 1, 2, 4, 5 and 8 to 10 can be found in the findings of fact.

Briefly stated, phase I of the proposal consisted of the preliminary design studies and wind tunnel investigations; phase II involved preparation of plans and drawings for manufacturing a prototype radome; phase III involved the actual manufacture and installation of the prototype radome in an aircraft; phrase IV concerned the installation of prototype electronic equipment from Lincoln Lab, as well as the design, development and installation of an antenna; phase V involved the design and development of the aircraft radar system; and phase VI covered the design for production of a DEW aircraft resulting from the work achieved in phases I to V. Plaintiff requested that this program be adopted by amending the 1041-c contract.

At the request of BUAER the April 7, 1954, proposal was replaced by subsequent letter, dated July 19, 1954, of the same general nature as the earlier proposal. The July 19, 1954, proposal provided in pertinent part as follows:

*Phase I :*

This phase is essentially complete relative to DEW/CIC design and consists of the following: Preliminary Design studies investigating airplane performance with various aero-dynamic configurations. Military Operations Research evaluation of each antenna radome configuration as to probability of detection with varying targets and studies of operational altitudes, speeds, etc., of the search airplane. Wind Tunnel model investigations of the likely Preliminary Design configurations utilizing these data to develop the final configuration and performance. Making additional wind tunnel tests of these final configurations including the effects of power. ·

 * * * * * *

*Phase V :*

This phase consists of the design and development of the airplane's radar system including operator's consoles, inter-communication systems, video distribution system, etc. The height finder capabilities of the antenna-radome

combination will be included in this phase. In order to move efficiently realize maximum compatibility of the airplane and the proposed operational concept, the Contractor requests the opportunity to assume responsibility for the radar system design requirements. ·

Both radar height finding and searching functions were operational requirements of the WV-2 aircraft. Thus the incorporation of a top-mounted UHF search radar on the WV-2 presented potential compatibility problems with the already top-mounted AN/APS–45 height finding radar.

At the time of the proposal the parties do not appear to have settled upon any particular structural design to solve the compatibility problems. Thus the work under phase I could have included consideration and design of either two radomes to house the height finding and search radars or a single radome to perform the same task. In addition, phase V appears to have left open the option of plaintiff's designing a new radar system to achieve the height finding and search functions that were then being performed by the AN/APS–45 and AN/APS–20B radars.

Paragraph 6 of plaintiff's July 19, 1954, proposal evidences Lockheed's awareness of these compatibility considerations. However, this paragraph also reveals that Lockheed had developed a radome configuration " * * * which permits installation of the presently available APS-45 height finding equipment with its antenna mounted in the radome support pedestal." It thus appears that Lockheed had at least initially felt it could solve the compatibility problems by designing a configuration for mounting both the UHF search radar and the AN/APS–45 height-finding radar on top of the WV-2 fuselage. This design afforded equivalent height finding capability to the then-existing WV-2 design.

Lockheed, by way of the proposal, also indicated that future radar development would most likely provide UHF height finding compatible with the Project Lincoln UHF search radar and that the resulting

two radar systems would increase surveillance capability. Thus the AN/APS-45 was proposed as an interim configuration " * * until the probable development suggested above [the hoped-for new UHF height finding radar] can afford height finding capability compatible with the range capability of the new Project Lincoln UHF search radar."

As a result of further negotiations with BUAER, the phase I proposal was modified by Lockheed in a conference letter dated August 27, 1954, as follows:

A. Design studies to include capability for CIC with APS-45 as interim configuration. Evaluate effect of Fore and Aft location and Vertical Height in regard to basic performance of the airplane.

"CIC" is an acronym for combat information center for housing the electronic equipment, such as radar, for deriving its own, as well as target aircraft information.

It thus appears that the parties had decided that the AN/APS-45 should be used as an interim height finding radar and Lockheed proposed that the contract be modified additionally to include a study of the operation and performance of the AN/APS-45 vis-a-vis the radome antenna configurations it had evolved.

Amendment 7 to the 1041–c contract was executed in August 1955 and reflected the negotiations between the parties. This amendment provided, by way of phase I, for a continuing research, development and test program for an AEW/CIC/DEW aircraft. Phase I in pertinent part reads as follows:

(a) The Contractor shall conduct preliminary design studies and military operations research evaluations of various radome-antenna configurations of AEW/CIC/DEW aircraft, including all pertinent independent and related aspects of radar and airplane performance, and including design and operations considerations for APS-45 Height Finding.

This work was to be performed in conformance with the July 19 and August 27, 1954, Lockheed proposal letters.

A careful review of the evidence of record amply demonstrates that over the years, and as late as December 1956, both plaintiff and defendant were content in continuing with their initial plan of incorporating both an AN/APS-70 search radar[15] and an AN/APS-45 height finding radar on top of the WV-2 aircraft.

Subsequently, in February of 1957, amendment 14 to the 1041-c contract, over which the parties focus their argument, was adopted, subject to the same July 19 and August 27 proposals, and provided in pertinent part as follows:

Conduct a design study program and wind tunnel investigation of the AEW/CIC/DEW aircraft. Modify one (1) Government Furnished WV-2 airplane into a rotadome airplane. Install radar equipment to make an operational electronic evaluation airplane and conduct tests.

The scope of work outlined by amendment 14 which appears below is identical to that of amendment 7, which it replaced:

(a) The Contractor shall conduct preliminary design studies and military operations research evaluations of various radome-antenna configurations of AEW/CIC/DEW aircraft, including all pertinent independent and related aspects of radar and airplane performance, and including design and operations considerations for APS-45 Height Finding.

Amendment 14 also contained a retroactive costs provision as follows:

11. Costs not in excess of $3,726,179.00, incurred subsequent to 1 April 1954 and prior to 1 February 1957, and which if incurred subsequent to the date of this amendment, would have been considered as allowable costs hereunder, shall be considered as allowable costs.

A contemporaneous interpretation of the scope of work authorized by amendment 14 is provided by a procurement analyst's

---

15. The AN/APS-70 search radar was a UHF radar which replaced the AN/APS-20B.

March 21, 1957, statement, which provided in pertinent part:

2. Under Contract NOas 52–1041–c as amended, Lockheed Aircraft Corporation has been conducting a research and development program to modify a WV-2 aircraft to meet CNO Confidential operational requirement NOad-06502 as a non-carrier based AEW aircraft for improved and unrestricted tactical AEW warfare. The proposed procurement represents an increase in scope under the aforesaid contract, the purpose of which is to determine the radiation patterns of the AN/APS-45 and the AN/APS-70 radar antennas when installed in their radomes on top of the WV-2E fuselage. It is deemed essential and expedient to determine the effects of aircraft fuselage and radomes on the radiation patterns to assure that the radar system of the WV-2E aircraft will be at optimum performance in order that the production version of the aircraft will be capable of performing its planned operational mission.

In addition to the above provisions and amendments, the original 1041-c contract contained the following patent rights clause in *para. 36:*

(a) As used in this clause, the following terms shall have the meanings set forth below:

(i) The term "Subject Invention" means any invention, improvement or discovery (whether or not patentable) conceived or first actually reduced to practice either (A) in the performance of the experimental, developmental or research work called for under this contract * *.

\* \* \* \* \* \*

(b) The Contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, nontransferable, and royalty-free license to practice, and cause to be practiced for the Government throughout the world, each Subject Invention in the manufacture, use, and disposition according to law, of any article or material, and in the use of any method * * *. Nothing contained in this paragraph shall be deemed to grant any license under any invention other than a Subject Invention. * * *

It is defendant's position that the Richter invention was inextricably related to the scope of research required in evaluating the "* * * radome-antenna configurations of ADW/CIC/DEW aircraft, including all pertinent independent and related aspects of radar and airplane performance, * *" as set forth by amendment 14. Specifically, defendant's argument is premised on the contention that amendment 7 required Lockheed to conduct design studies on the previously-developed WV-2 radome antenna configurations using the top-mounted AN/APS-45 height finding radar with the top-mounted UHF search radar as an interim configuration if such a configuration provided CIC capability. For this reason, defendant argues that the phrase "* * * to include capability for CIC with APS-45 as interim configuration * * *" was incorporated into amendment 7 of the contract by reference to Lockheed's August 27, 1954, proposal letter. Building on the above premises, defendant goes on to argue that since the feasibility of using the AN/APS-45 height finder in conjunction with the new UHF search radar was uncertain, amendments 7 and 14 called for a broad inquiry into radar design to achieve CIC capability. Consequently, the Government concludes that Richter's invention was an integral component of the preliminary research of the 1041-c contract, thus entitling the United States to a royalty-free license to practice the invention by virtue of the patent rights clause, relying on the decisions of this court in *Technitrol, Inc. v. United States,* 440 F.2d 1362, 194 Ct.Cl. 596 (1971), and *Mine Safety Appliances Co. v. United States,* 364 F.2d 385, 176 Ct.Cl. 777 (1966).

It is concluded, for reasons which follow, that defendant's analysis is incorrect.

This court has recently stated that in order to establish the close and umbilical connection which was necessary to its decisions in *Mine Safety* and *Technitrol,* a defendant must do more than "* * *

broadly allude to various 'connections' or 'contacts' * * *" between an invention and a contract, but rather must supply hard facts to support its position that a license exists. *See Rel-Reeves, Inc. v. United States,* 186 USPQ 21 (Trial Div., Ct.Cl.1975), 534 F.2d 274, 209 Ct.Cl. 595 (1976).

In *Mine Safety,* the University of Southern California (USC) had contracted with the Navy Department in April of 1946 to conduct research on the physiological, biochemical and anatomical effects of acceleration on the body as it related to pilot position in high speed aircraft. The contract contained the following patent rights clause (364 F.2d at 388, 176 Ct.Cl. at 782.):

(a) Where used in this Section, and not elsewhere in this contract, the expression "Subject Invention" means each invention, improvement and discovery (whether or not patentable) conceived or first actually reduced to practice (i) in the performance of this contract, * * * or (ii) in the performance of any research or development work relating to the subject matter hereof which was done upon the understanding that this contract or any subcontract hereunder would be awarded * * *.

(b) Contractor agrees to and does hereby grant to the Government an irrevocable, non-exclusive, non-transferable and royalty-free license to practice, and cause to be practiced for the Government, throughout the world, each Subject Invention in the manufacture, use and disposition according to law of any article or material, and the use of any method * * *

Concluding that the Government had reserved to itself a royalty-free license under the patent rights clause to practice a patent disclosing a crash helmet that was invented by two USC employees working in a USC aviation medicine program, the court premised its holding on a combination of several interrelated factors.

Specifically, the court, in finding a close connection between the Navy contract and the USC helmet program, noted several relevant indicia:

1. A final report by USC under a predecessor contract which indicated that personal protective gear necessary to decrease the hazards of crash landings would be undertaken;

2. Documentary evidence which indicated that both the Navy and USC expressly anticipated the development of better protective gear as a result of the contract work;

3. The close physical proximity of where the helmet project and contract work was performed;

4. The assignment, full-time, of one of the patentees to work under the contract, during which time the patented crash helmet was made; and

5. Post-invention documentary evidence which indicated that the Navy considered the development of crash helmet equipment to be part of the contract work and the USC's acquiescence in this position.

The court noted that (364 F.2d at 391, 176 Ct.Cl. at 787):

There was a close and umbilical connection which was not, and could not be, severed. We need not go so far as to say that the helmet program as a whole was an integral part of the Navy contract— though there is strong support for that position—but we do hold that the license clause of Section 17, *supra,* covered an invention so intimately tied to the work to be done under, and the results anticipated from, that agreement. As suggested above, we read the scope of the Navy program in accordance with the parties' contemporaneous construction—and contrary to plaintiffs' present contention—as including from the beginning head-impact research within the contractual concept of "acceleration".

and concluded that (364 F.2d at 391, 176 Ct.Cl. at 787–88):

At least in those instances in which the invention was conceived or practiced during the existence of the contract, it is enough that an important factor in the invention was itself within the contractual scope, or resulted directly from the

course of contract performance. That is the import, as we understand it, of the general phrase "in the performance of this contract." It is immaterial, therefore, whether or not the practical development of impact head gear was, in and of itself, within the Navy agreement. That was only one aspect, though an important one, of the invention. The physiological, biochemical, and anatomical research on impact-acceleration and the study of energy-absorbing materials—which had to precede or accompany the practical head-gear applications—were also necessary and important components; and such research *was* an integral part of the contract. Without these contract-covered inquiries, the final invention would not have been made.

The contract language relied upon by defendant in asserting that the Richter invention falls within the contractual scope of the 1041-c contract is anything but a model of clarity of expression. The phrase "[d]esign studies to include capability for CIC" is at best speculative and varying interpretations are urged by the parties. Indeed, the language appearing in amendments 7 and 14, "including all pertinent independent and related aspects of radar and airplane performance" cannot be interpreted reasonably *in vacuo.*

▮ Where such contractual language as appears here is unclear and suggests several speculative interpretations, the scope of the language must be read in accordance with the parties' contemporaneous construction, *Mine Safety, supra,* 364 F.2d at 391, 176 Ct.Cl. at 787, and extrinsic evidence is admissible to show what the parties intended it to mean. *Blackburn v. United States,* 116 F.Supp. 584, 586, 126 Ct.Cl. 874, 877 (1953).

▮ A careful reading of the documentary evidence surrounding amendments 7 and 14 to the 1041-c contract leads to the conclusion that the parties' actual intent was to adapt the AN/APS-45 and AN/APS-20B radars (later replaced by the AN/APS-70) for use in the WV-2. In this light, Lockheed's contractual duties, specifi-

cally calling for studies of "all pertinent independent and related aspects of radar and airplane performance," are clearly understood to relate to a study of the effects of various radome-antenna configurations on the performance of the Government-furnished radar systems. Thus, it is concluded that the design of a new radar was not expressly contracted for.

Additionally, few, if any, of the factors which played a role in the decision of the court in *Mine Safety* that the helmet invention had a close and umbilical connection to the contract work appear in this case with respect to the Richter invention and the 1041-c contract.

Defendant attempts to bring the Richter invention within the purview of the contract retroactively by means of the reimbursement clause in amendment 14 to the 1041-c contract. However, the simple fact is that there is no evidence indicating that Lockheed ever actually received any money under this clause. Further, if money was paid to Lockheed thereunder, there is no evidence as to what specific work was compensated for, and there was certainly no evidence that Richter's invention was retroactively compensated for.

Defendant has not shown that the development of Richter's invention was causally connected to plaintiff's program to design a new radome-antenna assembly for the WV-2 under the 1041-c contract, since, independent of the 1041-c contract and indeed as far back as World War II, a need existed for a single radar to accomplish both height finding and searching.

A number of equally persuasive factors also distinguish the case at bar from *Mine Safety, supra.* To begin, the most that defendant has shown is that Richter performed routine production-type ground tests on the AN/APS-20B and AN/APS-45 radomes to see that they met performance specifications. The record is totally devoid of any evidence tending to show that Richter performed radar design work under the 1041-c contract or that Lockheed was later reimbursed therefor. Thus, defendant is

unable to argue, as was the case in *Mine Safety*, that Richter was only able to make his invention because of the knowledge he gained from his work under the 1041-c contract.

Additionally, the Navy was at least constructively notified of Richter's invention since it was disclosed by Richter to NRL, as well as Mr. Leo Puckett, the Government's project engineer for the avionics system electronics on the WV-2, aircraft. Further, the Navy Department's 1041-c contract file contained a statement signed by a Government official that the patent and royalty requirements of the contract had been complied with by Lockheed. This lends some further credence to the conclusion that the Richter invention was not felt to come within the scope of work called for by the 1041-c contract nor contemporaneously viewed as such by the parties.

In sum, defendant has failed to prove that the design of a radar system such as Richter's was expressly included in the 1041-c contract.

To the contrary, the evidence clearly shows that the parties continuously intended to use both an AN/APS-45 height finding radar and an AN/APS-20B (later replaced by the AN/APS-70B) search radar to fulfill the operational requirements of the 1041-c contract.

Obviously, defendant has not established the presence of such a "close and umbilical connection" between the contract work and the Richter invention as to justify a conclusion similar to that reached in the *Mine Safety* and *Technitrol* cases. To the con-

trary, the facts show that the Richter invention was not conceived in the performance of the experimental, developmental, or research work called for by the 1041-c contract.

### Conclusion

It is concluded that claims, 1, 2, 4, 5 and 7 to 10 of Richter patent 3,001,191 are valid and the inventions covered by claims 1, 2, 4, 5 and 8 to 10 are found to have been used and/or manufactured by or for the defendant without authorization or license from plaintiff.

### CONCLUSION OF LAW

Upon the findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1, 2, 4, 5 and 7 to 10 of United States Letters Patent No. 3,001,191 are valid and the inventions defined by claims 1, 2, 4, 5 and 8 to 10 have been used and/or manufactured by or for defendant without authorization or license from plaintiff, that plaintiff is entitled to recover reasonable and entire compensation therefor, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 131(c)(2).