## Charles P. FOGARTY

v.

## The UNITED STATES.

No. 12–77.

United States Claims Court.

May 30, 1984.

Bernard Malina, New York City, for plaintiff.

William O. Geny, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge.

Plaintiff seeks recovery under 28 U.S.C. § 1498 of reasonable and entire compensation for the unauthorized use and manufacture by or for the United States of the docking system used in the Apollo space mission, which allegedly is covered by claims 17 and 20 [1] of United States Reissue Patent No. Re. 27,903 ('903). The '903 patent was granted on January 29, 1974, to Charles P. Fogarty.

The '903 patent was based upon an application filed April 5, 1971, for the reissue of patent No. 3,478,986 ('986). The '986 patent was, in turn, based on a continuation-in-part (CIP) application that was filed on December 6, 1967. The December 6, 1967, application was a CIP of abandoned application Serial No. 487,194, which was filed in the United States Patent and Trademark Office (PTO) on September 14, 1965.

### Background Facts

Plaintiff's application of September 14, 1965, entitled "Magnetic Coupling System for Artificial Space Bodies," related "to the coupling of space vehicles and more particularly to the alignment and connection of artificial space bodies through the utilization of magnetic forces." [2] As stated in

1. Although plaintiff's petition accused defendant of infringing claims 17, 20 and 21–24 of the reissue patent, plaintiff's pretrial submission contains claim infringement charts for only claims 17, 20, 21, 22 and 24. Plaintiff's brief and requested findings of fact pursuant to Court of Claims Rule 134 only accused defendant of infringing claims 17 and 20. Rule 134(c) required the parties to file a brief and requested findings of facts. Rule 134(d) specifically provided that the "[r]equests for findings shall be in the form of distinct numbered propositions of the facts which the party desires to have found * * *." In addition, Rule 134(g)(2) provided: "Unless a party has requested a particular finding of fact, the court may refuse to consider his exception to the trial judge's report for failure of the trial judge to make such finding." Thus, as noted by defendant's request for findings, claims 21–24 are no longer asserted against the accused device in this action. Plaintiff's attempt to include claims 21 and 24 in this case by way of his reply brief of June 18, 1982, coming as it does after defendant's brief and requested findings of fact were filed, is ineffective to bring these claims before the court.

Moreover, plaintiff is deemed to have abandoned assertion of claims 21–24 since no findings of fact were prepared with respect to these claims, and they were not addressed in plaintiff's brief. *Lockheed Aircraft Corp. v. United States*, 213 Ct.Cl. 395, 401, 553 F.2d 69, 72 (1977).

2. Application for Patent, Serial No. 487,194, at 1.

the objects of his specification, plaintiff wanted to provide—

> a method for uniting two objects in space with expedience and control and with the obviation of difficulties concerning alignment and impact of said objects.[3]

The drawings in this initial application consisted of six figures which substantially correspond to Figs. 1–6 of the '903 reissue patent. As is evident from a description of these figures, they all depict space vehicles or space stations which have been or are being drawn together by magnetic or electromagnetic coupling devices.[4] Moreover, the original 12 claims were, either specifically or because of the manner in which they were drafted, limited to space vehicles which employed magnetic coupling means.

In overcoming the rejection of original claims 9 and 10 on the basis of two prior art patents, plaintiff's argument to the PTO focused on the exclusive use of magnetic coupling in his invention:

> To apply the aforediscussed primary reference [Jernigan, Jr.] with Dunn who is concerned with bringing about final closure of space vehicles through the connection of mechanical fingers rather than by magnetic means, appears to be an improper combination of references which, even if proper, would not suggest that which the applicant has done.[5]

Six claims, all of which were limited to systems employing magnetic couplings, were thereafter allowed.

On December 5, 1967, plaintiff filed application Serial No. 691,107 in the PTO. This was a CIP of the plaintiff's previous application. The new matter added to the original application consisted primarily of new figures, which appear as Figs. 7–11 in the reissue patent in suit, and a description of these figures in the specification.

The title of plaintiff's CIP application was changed to "Space Delivery System," and plaintiff's abstract of his disclosure stated:

> The present disclosure relates to a space delivery system for delivering items between space vehicles or for coupling space vehicles. The device involves a flexible extensible cable fed from a reel and through which is delivered gas to the front of the cable where it is directed backwardly to propel the front end of the cable forwardly.[6]

The CIP application changed the scope of the invention to include mechanical as well as magnetic coupling. Thus, the new Figs. 7–11 emphasized that mechanical coupling, in addition to magnetic coupling, could be used. Consonant with this, new claims were directed to the new subject matter and included along with the original allowed claims 1–6.

Following the allowance by the PTO of all of plaintiff's 20 claims, plaintiff on April 5, 1971, filed a notice of filing of reissue application. Plaintiff's declaration indicates that he believed the original patent was inoperative or invalid by reason of his

---

**3.** *Id.*

This object not only appeared in plaintiff's original application, but remained in his continuation-in-part and reissue applications and the patent in suit.

**4.** For example, Fig. 5 shows a magnetic harpoon connected to the space vehicle by an extensible tubular cable. Gas is provided to propel the magnetic harpoon toward an object to be secured, and a retraction mechanism for retrieving the secured object is also provided.

**5.** File wrapper of plaintiff's original patent application, at 24.

**6.** This should be contrasted with the abstract in his original application which provided:

> A first artificial space body having *magnetic securement members* located at the surface thereof, *said magnetic members* being alignable and securable with respect to *magnetic members* similarly provided on a second artificial space body, said artificial space body having further *magnetic coupling means* which is extensible with respect to said space body and capable of being propelled to positions distant with respect to said space body whereby said *magnetic coupling means* can be directed toward and against said second artificial space body whereafter said first and second space bodies can be drawn together and alignedly secured by said *magnetic securement members.*
> (Emphasis added.)

claiming less than he had a right to claim in the patent because:

> the claims in this patent do not appear to include a *rigid* extensible tubular member and further do not include the case where the rigid extensible tubular member comprises a telescopic construction;
>
> claim 20 in the application recites "an extensible tubular member movably connecting said securing means with said space object." The specification states in the final sentence thereof as follows: "The tubular member may be of telescoping construction and thus extensible and rigid." Thus, although the disclosure indicates that the tubular member may be rigid and also of telescoping construction, inadvertently these features were not claimed;
>
> * * * and it was not until the issuance of the Paine patent No. 3,526,72 [sic] on September 1, 1970 that applicant and his attorney realized that broader claims should be obtained; * * *.

The examiner, in the course of rejecting all of the claims of the reissue application, pointed out that the new claims, directed as they were to the attributes and telescopic nature of the tubular member, were more specific, not broader, than the previously allowed claims. In response, plaintiff insisted that:[7]

> [t]he concept of a rigid telescoping construction for the extensible tubular member is definitely supported by the present specification. It is submitted that it is this broad concept in combination with the other features of claim 20 which is truly the subject matter which the applicant regards as his invention. The particular means for propelling and retrieving the securing means is not the inventive part of the present invention. *The inventive concept here is the use of a securing means with a space object for delivering items between space vehicles utilizing an extensible tubular member between the securing means and the space object. Once this concept is known, the particular means for accomplishing it would be readily obvious to anyone of ordinary skill in the art. There are probably dozens of means for propelling and retrieving a securing member when a rigid telescoping tubular member is used between it and the spaceship.*

(Emphasis added.)

### The Patent in Suit

The reissue patent in suit relates to a device for the connection and docking of objects in space. The invention basically consists of an extensible tube with a securing device attached to one of its ends. The other end of the tube is connected, by way of a take-up reel, to a gas supply. The gas supply is used to propel the securing device to a desired target. Plaintiff's patent makes clear that the securing device may be any means which is capable of attaching objects, such as a coupling or grappling means.

### Claims in Suit

The claims in suit are set forth below in their entirety:

> 17. In a space vehicle, the combination comprised of securing means and an extensible tubular member for use as a conduit means, said tubular member movably connecting said securing means with said space vehicle, motivation means adapted to propel said securing means to positions spaced with respect to said space vehicle, and retraction means capable of regulating the distance between said securing means and said space vehicle.
>
> *  *  *  *  *  *
>
> 20. In an artificial space object, the combination comprised of securing means and an extensible tubular member movably connecting said securing means with said space object, motivation means adapted to propel said securing means to positions distant with respect to said

---

7. Reissue Patent No. 27,903, at 28.

space object, and means for retrieving said securing means.

A comparison of the claims shows that they basically cover the same combination, except that the extensible tubular member of claim 17 is to be used as a conduit means. The specification explains that the tubular member may act as a conduit to transport materials, electric power, communications, etc., from one space vehicle to another.[8]

The defendant has raised a number of defenses in opposition to plaintiff's charges. Defendant contends that the patent in suit fails to meet the novelty requirements of 35 U.S.C. §§ 102(a), (b), (e) and (g). In addition, defendant argues that plaintiff's patent is invalid for obviousness under 35 U.S.C. § 103. Finally, defendant maintains that the Apollo probe does not infringe the '903 patent. An evaluation of these defenses requires a determination of the invention dates of the claims at issue.

### Invention Dates of Claims in Suit

Claims 17 and 20 appear for the first time in CIP application 691,107, which was filed on December 6, 1967, and issued as United States Letters Patent No. 3,478,986 on November 18, 1969. As previously pointed out, the specifications and claims of plaintiff's patent application 487,194, which was filed in the PTO on September 14, 1965, were exclusively devoted to a magnetic coupling system. The drawings, which consisted of Figs. 1–6, only illustrated and taught the use of magnetic coupling. In fact, all of the claims ultimately allowed in the '194 application were restricted to magnetic securing devices.

Plaintiff argues that he was attempting to broadly claim all securing means, wheth-

er mechanical or magnetic in his original 1965 application. He points to original claim 11, which was cancelled shortly after the original filing date, and which includes "coupling means" as one of its elements, in support of his position that he intended to cover all types of securing means and not only magnetic securing means. Plaintiff's argument must be rejected for the simple reason that it is contrary to the law and the facts.

To begin, 35 U.S.C. § 112 provides in pertinent part that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Since the only coupling means disclosed in the plaintiff's original application was magnetic, it is clear that the term "coupling means" of original claim 11 could only cover the magnetic harpoons shown in Figs. 5 and 6 and equivalents thereof. There has been no testimony to show that mechanical coupling is equivalent to magnetic coupling. Indeed, if this were so, plaintiff would not have found it necessary to file his CIP application to cover the nonmagnetic securing devices.[9] Accordingly, claims 17 and 20 are only entitled to the filing date of the CIP application, i.e., December 6, 1967.

### Accused System

NASA Technical Note D–6854, entitled "Apollo Experience Report—The Docking

---

**8.** In defining the tubular member at Col. 5, lines 51–58 provide:

> The cable which may be tubular as described, may be used as a conduit through which materials may be transported from one space vehicle to another. Electrical power, communications and the like may similarly be carried via such cables. The tubular member may be of telescoping construction and thus extensible and rigid <u>as in FIGURE 12 wherein</u>

<u>101 represents any suitable means for propelling and retrieving the securing means 103.</u> (The underscored portion indicates the additions made by reissue.)

**9.** Claim 11 cannot be said to have been an attempt to claim a generic group of securing devices because at that time only magnetic coupling was disclosed. Thus, the plaintiff's 1965 original patent application did not support a generic claim.

System" by Robert D. Langley (June 1972), describes the development of a docking system for the Apollo 13 mission from the July 1962 period when it was first decided that a manned lunar landing would be performed by a lunar orbit rendezvous technique. The technique called for a structural connection of two space vehicles (the Command Module (CM) and the Lunar Module (LM)), an intravehicular transfer of crew and supplies between the two space modules, the separation of the LM from the CM to enable the LM to accomplish its lunar mission, and the rejoining of the LM to the CM for the retransfer of men and equipment after completion of its mission. The Note describes the seven systems considered by the Manned Space Center in developing a docking system which could best serve the needs of the Apollo mission. These seven systems were classified into Impact or Non-impact systems. Impact systems were defined as "those systems that achieve initial capture of the passive vehicle [LM] by initiating a closure rate between the vehicles to effect contact."[10] The three impact docking systems evaluated were the probe and drogue, the ring and cone, and the Gemini system.

Nonimpact docking systems were defined as "those systems that achieve initial capture of the passive vehicle [LM] by extending a member from the active, stationkeeping vehicle [CM]."[11] The four nonimpact systems evaluated were the inflatable probe, the stem, the stem and cable, and the inflatable tunnel.

Because experience with hardware in space was for all intents and purposes nonexistent in the 1962–63 era, and because ground-based simulation was also limited, the contractors developed "a two dimensional mathematical model to define the dynamic characteristics of the proposed systems." Although the tests indicated that all of the proposed concepts were feasible, the Note did, *inter alia*, reach the conclusion that nonimpact systems would require more fuel or more complex piloting procedures than impact systems. Of the impact systems, the probe and drogue system was favored because it provided the least weight penalty, whereas the ring and cone arrangement enabled a better crew transfer. Ultimately, the probe and drogue concept won out, and on December 31, 1963, the CM contractor was told to proceed with the design of this system. By early 1964, the following changes[12] were made in the initial design concept of the probe and drogue system:

(1) The initial capture latches were relocated from the drogue to the probe head to reduce weight.

(2) The central attenuator was deleted and three pitch bungees were replaced with an attenuator and a tension tie; this change provided redundant axial attenuation as well as attenuation for pitch arm contact loading.

(3) The mechanical retract device was deleted and an internal pneumatic retract system was incorporated to improve reliability.

In operation, the probe, as shown below, was removably mounted on the CM, while the drogue was removably positioned on the LM. The probe and drogue is shown pictorially below to assist in an understanding of the Apollo system.

10. NASA Technical Note, at 3.

11. *Id.* at 4.

12. While the Note characterizes them as "major" deviations from the initial concept configuration, the changes were obviously prompted to improve reliability, enable the vehicles to withstand the impact shocks, and to reduce the weight of the LM.

launch had to be aborted. While the craft was in earth orbit, the docking probe head was extended 10 inches, through operation of the arm assembly, in anticipation of a docking with the LM and Saturn booster during the translunar phase of the mission. This maneuver, which is called transposition docking and occurred shortly after translunar injection, began with the separation of the CM from the Saturn booster. During the maneuver the CM and LM docking hardware is aligned and the speed of the CM is adjusted to permit a docking between probe and drogue. The probe impacts against the inside walls of the drogue and is ultimately funneled into proper position such that the spring-loaded capture latches carried on the probe head engage with and lock into a mating capture ledge of the drogue. As shown in the following drawing, the arm assembly is constructed so as to attenuate the impact energy resulting from the docking operation.

*Apollo Docking System With Probe in Extended Position*

Prior to liftoff of the Apollo spacecraft, the docking probe assembly was installed in its retracted position, by collapsing its arm assembly to thus overcome the spring bias which keeps the piston-like probe in its fully operational position. Provisions were made to sever the probe assembly if the

Arm Assembly

*Probe Shown in Retracted and Extended Position by Operation of Arm Assembly*

Following crew confirmation that the capture latches have all operated properly, a probe retract operation is initiated to achieve a hard docking of the LM and CM

vehicles. This can be done manually or automatically. The automatic retraction is accomplished by nitrogen pressure cartridges. The crew and equipment are then transferred from the CM to the LM. After necessary hookup operations are complete,

the docked CM and LM are separated from the booster rocket and continue in translunar flight.

The transfer of men and supplies between the LM and CM is achieved through a passageway formed between the LM and CM vehicles after removal of the probe, drogue and related hardware. In preparation for the lunar descent, the LM crew entered the LM by way of the passageway. The probe and drogue were then reinstalled, with the probe in a preloaded state. In this state, the LM and CM vehicles were held together by cooperation of the probe and drogue. At the proper time the probe is unlatched and a separation of the vehicles is achieved. In its fully extended position the probe is approximately 10 inches in length. Upon separation, the extended probe is properly positioned for the subsequent docking event.

The next operation, lunar orbit docking, occurs following completion of the lunar mission, and consists of a docking of the LM and the CM vehicles. Following impact docking, the probe, drogue and other hardware are removed to reform the passageway between the vehicles and to permit the retransfer of men and supplies back to the CM. The CM's hatch covers are then sealed and the LM, being no longer necessary, is jettisoned into space.

### Validity of Patent

Defendant urges that Fogarty is not entitled to his reissue patent because it failed to meet the conditions of patentability set out by Title 35 U.S.C. §§ 102(a), (b), (e) and (g). Since, as will become evident, the Fogarty patent is found to be anticipated under § 102(e),[13] defendant's other § 102 arguments will not be considered.

In essence, claims 17 and 20 of Fogarty cover securing devices for use in space that can be manipulated from the spacecraft. The inventions covered by claims 17 and 20 are described in patent No. 3,268,091,

which issued to D.F. Melton on August 23, 1966, for an application filed on June 1, 1961.

Figure 3 of Melton, which is reproduced below, shows a securing means 152.

*Fig. 3*

While 152 is shown as a pair of motor-driven gripping jaws that can be opened and closed, the specification at Col. 2, lines 55–59, recognizes that magnets or other mechanical coupling could also have been used as the securing means:

> A variety of work performing devices may be attached to the manipulator. These may include gripping hands, hooks, magnets, rotary tools, etc., powered by electric, pneumatic, hydraulic, reactor thrust or other suitable actuating means.

Figure 3 also discloses a manipulator 100 that consists of a number of frame members, motors, gears, pinions and other hardware that are used to support and manipulate a pair of rotatable mounted reaction motors 128 and 130. Reaction motors 128 and 130 are provided with valves and motor nozzle arrangements 140–136 and 142–138 respectively. The valves are used to control the flow of efflux gas from the motors. In turn the valves are controlled by switches and cables, housed in and emanating from a command spaceship. The secur-

---

**13.** Section 102(e) provides that—
A person shall be entitled to a patent unless—
     \*     \*     \*     \*     \*     \*

    (e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, \* \* \*.

ing means is positioned by the operation of the reaction motors carried by the manipulator frame members.

In the embodiment shown in Fig. 3, the gas which escapes from nozzles 136 and 138 is contained within the large reaction motors 128 and 130. However, that is not the only way that the propellant can be supplied to the nozzles for positioning of the manipulator. As explained at Col. 2, line 28, the reaction motor is only one of several preferred forms which the invention can assume. Indeed, Melton discloses the flexible conduit concept of the patent in suit as an alternate embodiment at Col. 2, line 34:

> The thrust devices may be operated from the control vehicle by means of electrical, mechanical, fluid or electromagnetic means. Any suitable thrust device known to the art may be used such as fluid under high pressure, monopropellants, fuel and oxidizer combinations, devices containing radioactive materials from which energy is extracted to accelerate some mass contained in the device, or by pumping a propellant from a control vehicle [spaceship] to the manipulator and allowing the propellant to be expelled through a nozzle located on the manipulator.

Melton also teaches and discloses the retraction means of claims 17 and 20 of the patent in suit. The exact operation contemplated and claimed by Fogarty, as well as the structure to carry out the desired operations, is anticipated by Melton. Beginning at line 63 of Col. 2 and carrying over through line 17 of Col. 3, the operation is described in some detail. This passage explains that the manipulator can be connected to the control vehicle (space vehicle) by an "elongated flexible connecting means"—

> This cable is preferably wound around a powered drum, sheave or winch attached to the control vehicle. In operation, the manipulator may be forced outwardly from the prime vehicle by means of a reaction motor attached to the manipula-

tor and steered to the object to be positioned by means more fully described hereinbelow. After an object has been contacted and a connection made by the work performing attachment, the object can be brought to the control vehicle by applying tension to the cable or by actuating the thrust motor or both. As the object nears the control vehicle, reverse thrust can be applied to control the closing rate between the control vehicle and the object to be positioned.

(Column 2, line 68, through Col. 3, line 8.)

As shown above, the Melton patent describes the combination of elements of claims 17 and 20, to accomplish the same result sought by Fogarty. In addition, the June 1, 1961, filing date of the Melton patent application precedes not only the effective invention dates of claims 17 and 20, but also the September 14, 1965, filing date of plaintiff's original application. Accordingly, claims 17 and 20 in suit are found to have been anticipated by Melton.

It is moreover concluded that the above-referred to disclosures in the Melton patent are sufficiently clear that a person of ordinary skill in the art would, without resorting to speculation or guesswork, immediately understand their full implication. *See In re Arkley*, 455 F.2d 586, 587–88, (C.C.P. A.1972). This is adequately demonstrated by the trial transcript. Defendant's technical expert, Robert D. Langley, who held a bachelor of science degree in mechanical engineering and had worked at the Johnson Space Center in Houston, Texas, on the probe and drogue docking system used in the Apollo, testified that the Melton patent disclosed everything covered by the claims in suit. The following colloquy between Bernard Malina, Esq. (plaintiff's counsel), and the witness was made in response to an inquiry by Mr. Malina as to whether part 156 of Fig. 3 of the Melton patent functions as a conduit for a propellant.[14]

Q Do you still maintain that that's so, bearing in mind, or keeping in mind the

14. Trial transcript, at 694–95.

description of the embodiment of figure 3, which you have just read?

A Yes, I still maintain that position on figure 3 in view of column 2, line 42, wherein that possibility is allowed.

Q Mr. Langley, my question was to ask you to describe how figure 3 functions, what's in figure 3, how it works, what 156 is and what it is not. There is a description of the structure of figure 3 in the patent and I asked you to read that in order to tell me what the patent says about figure 3, not what you—

A The patent on columns 4 and 5 do [sic] not describe a tubular conduit.

Q And isn't it a fact that—

A —associated with figure 3.

Q But the passage from columns 4 and 5 do [sic] describe the structure and operation of the embodiment of figure 3 of Melton, isn't that so?

A Columns 4 and 5 describe an aspect that is depicted in figure 3. However, column 2, line 42 does not prevent an alternate means of a supply.

### Obviousness

In addition to its § 102 defenses, defendant contends that the patent in suit does not meet the nonobviousness subject matter requirement of § 103.[15] The Supreme Court, in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), approved the following three-step test to measure the obviousness of an invention: "Under § 103, [1] the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; and [3] the level of ordinary skill in the pertinent art resolved." These steps

have been applied in determining the obviousness of the Fogarty patent, and for reasons which follow it is concluded that the patent falls short of the § 103 standard.

The Melton patent, previously discussed, is unquestionably concerned with the same general subject matter as the patent in suit, *i.e.,* the performance of retrieval or positioning operations in space.[16] To accomplish this, Melton discloses:

> a manipulator which can be positioned and controlled from a [control] vehicle * * *. After a connection is made with an object * * * [in space], it is often desirable to apply forces to the manipulator structure from the control vehicle by means of a direct mechanical linkage between the manipulator and the control vehicle. In other cases, after a connection is made between the manipulator and an object to be positioned, it is desirable to apply actuating forces on the object by means of the manipulator itself while exerting little if any reaction force on the control vehicle.

(Column 1, lines 31–42.)

A reading of the Melton specification, as previously discussed, shows that either mechanical or magnetic securing means could be used in a gravitationless environment to grasp, move or manipulate any number of devices relative to a space vehicle to which the securing means is connected. When this disclosure is considered along with Technical Documentary Report RTD–TDR–63–4292 of the Defense Technical Information Center, dated February 1964,[17] it is evident that the subject matter of claims 17

---

**15.** Section 103 provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**16.** Hindsight in evaluating the plaintiff's patented invention is eliminated in this instance because the Melton patent not only falls within the same technical field as the patent in suit, but more importantly solves the same problem in substantially the same way.

**17.** This Report discloses a flexible conduit which is fed from a reel for the delivery of a gas to propel a securing device to a desired location in space.

and 20 is not unobvious, as required by § 103.

This Report contains the notation that it was released by its authors on December 17, 1963, for publication and presented the results of the "Orbital Attachment & Docking Validation Parameters" study by Lockheed Corporation. The Report is not being used as a § 102 publication, but rather to show the state of the art at or around the time of the invention in suit.[18] It should be recalled that the invention date of the claims in suit is December 6, 1967.

The Report discloses a number of systems to accomplish orbital docking, but of particular interest is the Extendible Lanyard and Grapple arrangement at 185–88. This embodiment, reproduced below, discloses a pneumatic supply line that feeds a pair of pressure jets for positioning a coupling head (which consists of a pair of closable jaws) in space. The pneumatic control lines are wound around a reel to enable retraction of the coupling head to the spacecraft.

The combination of the Melton specification and the Report discloses mechanical and/or magnetic securing means. The securing means are propelled to a position remote from the space vehicle by gas delivered through a flexible extendible cable to either the pressure jets of the extendible grapple or the nozzles 136 and 138 of the Melton manipulator. Finally, both the Report and the Melton patent disclose a reel to retract the pneumatic control line and regulate the distance between the securing means and the space vehicle.

Extendible Grapple

In Extended Position          In Retracted Position

A review of both the Melton patent and the RTD Report discloses each of the elements of claims 17 and 20, combined in the same manner to achieve the same purpose.[19] It is accordingly concluded that the combinations of claims 17 and 20 taken as a whole are not unobvious within the meaning of 35 U.S.C. § 103.

While defendant also urges a variety of other § 103 defenses, they are not considered in light of the above conclusion.

*Infringement*

Defendant also argues, because the Apollo probe and drogue is an impact docking

---

**18.** Plaintiff makes much about the restricted availability of this and other Defense Technical Information Center reports, and contends they were not published prior to his invention date. Defendant has raised a number of arguments which indicate that these reports may well be publications within the meaning of 35 U.S.C. § 102. However, it is not necessary to resolve this issue since there is no question that these reports, even if classified, are indicative of the general level of skill in the art in December 1963. *See Lockheed Aircraft Corp. v. United States,* 213 Ct.Cl. at 411–12, 553 F.2d 69.

**19.** It is also appropriate to recall plaintiff's own comments, which appear at 404, *supra*, to the

Patent and Trademark Office during prosecution of his reissue application:

> The inventive concept here is the use of a securing means with a space object for delivering items between space vehicles utilizing an extensible tubular member between the securing means and the space object. Once this concept is known, the particular means for accomplishing it would be readily obvious to anyone of ordinary skill in the art. There are probably dozens of means for propelling and retrieving a securing member when a rigid telescoping tubular member is used between it and the spaceship.

system while the patent in suit discloses a nonimpact arrangement, that it has not infringed any of the claims of the Fogarty patent.[20] Since invalid claims cannot be infringed, this argument is not considered.

### Conclusion

Claims 17 and 20 of the Fogarty patent are invalid under Title 35 U.S.C. §§ 102(e) and 103. Thus, plaintiff cannot recover and his petition should be dismissed.

20. Defendant points out that various portions of the '903 patent, including the object quoted at 403, *supra*, limit the coverage of plaintiff's claims to nonimpact docking systems. Defendant argues that when the limitations imposed by the specification of the Fogarty patent are considered along with an absence of any consideration as to how the energy created by impact docking would be dissipated, there can be no doubt that the Apollo probe and drogue device does not infringe claims 17 and 20.